(No. 14925.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ADAM BERKMAN, Plaintiff in Error.

*Opinion filed April 18, 1923.*

1. CRIMINAL LAW—*when circumstances connected with defendant's arrest are not admissible.* In a prosecution for assault with intent to murder a police officer, circumstances connected with the defendant's arrest one month after the commission of the crime with which he is charged and which have no connection with that crime but only tend to prove the commission of another offense are not admissible to prove the charge against him; nor is a revolver picked up at the place where the defendant was found lying after being wounded by police officers admissible to prove the offense charged, where it is not shown by competent evidence to be the revolver with which that offense was committed.

2. SAME—*bullet is not admissible unless clearly identified.* In a prosecution for assault with intent to murder, a bullet claimed to have been taken from the body of the victim by the attending physician is not admissible in evidence unless clearly identified by competent testimony tracing its possession from the time of the operation; and evidence that the physician handed the bullet to a nurse, whose name is not given, and that one of the nurses gave the bullet to the wounded man, is not sufficient to identify the exhibit.

3. SAME—*what is not sufficient to identify revolver offered in evidence.* In a prosecution for assault with intent to murder, a revolver found at the place where the defendant was apprehended for a subsequent offense is not proved to be the revolver which was used in the alleged assault, by the testimony of a police officer, who claims to be a fire-arms expert, that the rifling on the bullet taken from the wound must have been made by the revolver in question merely because it was a gun of a certain model.

4. SAME—*on what subjects opinion evidence is admissible.* The speed of customary vehicles of transportation, values of property, the mental or physical condition of individuals, the size, color and weight of objects, and other such facts, may be shown by opinion evidence when based upon proper facts and opportunities of witnesses to observe the things or persons, and where it is impossible for the witnesses to detail all pertinent facts in such a manner as to enable the jury to form a conclusion without such opinions.

5. SAME—*when a witness cannot give opinion as an expert.* Mere opportunity of observation does not change an ordinary observer into an expert, and special skill does not entitle a witness to give an opinion when the subject is one where the opinion of an ordinary observer is admissible or where the jury are capable of forming their own conclusions from the pertinent facts susceptible of proof in common form.

6. SAME—*facts, and not opinions, should be given in doubtful case.* Whenever it is doubtful whether a case falls under the rule which requires the statement of facts by a witness or comes within the exception permitting opinion evidence, the wise course is to place it under the rule, as adherence to the rule tends to prevent fraud and perjury and is one of the strongest safeguards of personal liberty and private rights.

7. SAME—*when receipt is not admissible to prove alibi.* Where witnesses have testified, in support of an alibi, that the defendant was with them at the time the crime was alleged to have been committed, and that they remembered the date because one of them borrowed some money from the other and gave a dated receipt, the receipt is not admissible to corroborate the witnesses.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HARRY B. MILLER, Judge, presiding.

FOREST GARFIELD SMITH, and JOSEPH A. PEPPETS, (LEO L. DONAHOE, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, ROBERT E. CROWE, State's Attorney, and EDWARD C. FITCH, (HENRY T. CHACE, JR., EDWARD E. WILSON, and CLYDE C. FISHER, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Adam Berkman (herein referred to as the defendant) was indicted, tried and convicted in the criminal court of Cook county and on April 6, 1922, was sentenced to the penitentiary for the crime of an assault with intent to commit murder upon John Rahn. He has sued out this writ of error to review the judgment.

The prosecuting witness, John Rahn, was employed by the Chicago and Northwestern Railway Company as a railroad patrolman. He performed his duties as such patrolman at the Proviso yards of the Illinois Central Railroad Company in the city of Chicago, between Lake street and the St. Charles road. He worked on the night shift. There had been frequent burglaries of railroad cars on those tracks at the hour of changing shifts, between 6:30 and 7:30 P. M., especially on a particular track within the yard known as the ice-house track, where cars of perishable merchandise were iced. On the evening of March 13, 1921, there were about twenty or twenty-five cars on the ice-house track, and Rahn, who had started on his shift earlier than usual that evening for the purpose of detecting any burglary that might occur, walked under a bridge crossing a creek in the yards and stopped for a short time. He came out from under the bridge on the north side, and looking north along the north side of the cars saw a man approaching from the north. With drawn gun Rahn approached and met the man and they both stopped. Rahn asked him where he was going, and he replied, "I am going home; let me go." Noticing something shiny in the hand of the man in his left overcoat pocket, Rahn asked him what he had, and he replied that he had a flashlight. Not believing him, Rahn

reached his left hand into the man's pocket and took there-from a flashlight. The man then retreated or jumped back about five or ten feet and drew a gun and shot Rahn, strik-ing him in the left breast. The man then started to run and fired another shot, and at the same moment Rahn shot at him. The second shot struck Rahn on the right chest, fractured a rib, punctured his lung and broke the shoulder bone. The second shot caused Rahn to drop his revolver, and he also dropped to the ground from the effects of the wound. Rahn testified that he was very sure he wounded the man, because he saw him staggering down the bank of the creek. The man was not apprehended at that time. Rahn further testified that the shooting occurred at 6:35 in the evening and while it was raining and very dark, but that he had a good opportunity to observe the man. He described him as being about six feet tall, weighing about 180 pounds, of dark complexion and having a very dark mustache cut straight across the upper lip, and that he wore a long, dark overcoat and a cap. He also stated that the man had two or three upper front teeth filled with gold, two of which were fully covered with gold in front. He stated several times that it was dark at the time he met this man and raining hard and that he never saw the man be-fore, yet he further states that he took a good look at his face. He did not notice anything peculiar about his eyes except that they were large. He noticed nothing peculiar about his nose or about his mouth except that he had a large mouth. He noticed nothing peculiar about his chin. He did not take any particular notice of the shape of his head, because he had only about two minutes to observe him. He could not tell for sure whether or not the man had gloves on his hands, and gave as his reason that it was dark.

A month after the occurrence above mentioned, on April 13, 1921, the defendant was seen by two patrolmen on the railroad tracks of the Indiana Harbor Belt Railway

Company at Broadview, which is some distance south of the Proviso yards. Both patrolmen shot the defendant as he was running away from the railroad tracks, and both of them pursued him into a field, or into what they refer to as the prairie, where they found him lying down, wounded. One of these patrolmen testified that he searched him and turned him over, and the other patrolman testified that he had a good view of him after turning his flashlight on him. It is clear that the police officers did not put him under arrest that night, as the testimony of Dr. Awotin discloses that the defendant reached the place where he was boarding and was treated by the physician for two fresh gunshot wounds about three o'clock in the morning of April 14 and then was taken to the West Side Hospital. After Dr. Awotin got him into the hospital he telephoned to the police station at Warren avenue, giving them full information about the defendant being wounded and where he was. The police officers then came out and examined the defendant. A photograph was obtained of the defendant and his picture appeared in the Chicago newspapers with a full story concerning him, which does not appear in this record. The testimony of the police officers as to the fact of his running away from the railroad tracks and their shooting him and examining his wounds was excluded from the jury after it had been stated in the presence of the jury. The officers were permitted by the court to testify that the man they shot and whom they examined on the prairie was the defendant. They further testified that they saw him at the West Side Hospital, and pointed out the defendant as the same man they examined in the field and saw at the hospital. The policemen also testified that on the morning of April 14, after they had shot him and after daylight, they examined the prairie, and near where Berkman was lying the night before found a pistol, which is described in the record as a Colt automatic 32. The prosecuting witness, Rahn, after he had seen the defendant's picture in

the papers and read the newspaper story accompanying it, went to the hospital for the purpose of identifying the man who had shot him, in company with policeman Scott Dickson, who took Rahn there for the purpose of such identification. Rahn testified that after examining and looking into the faces of twelve patients, including the defendant, he identified the defendant as the man who shot him as soon as he looked into his face, and on the trial he also pointed out the defendant as the man who shot him and as the man whom he pointed out at the hospital as the one that shot him.

The defendant, as a witness in his own behalf, testified that he had spent all of the day of March 13, 1921, at the home of John Kukis; that he ate supper there about 6:30 in the evening with Kukis and his wife and two other men, Emil Karlson and Christ Stenzel, who were visitors of Kukis and who came there a little after four o'clock that afternoon; that he played cards with the three men after supper and until about ten o'clock, and did not leave the house during all of that time. He positively denied that he was at the Proviso yards on March 13, 1921, and denied all knowledge of the shooting of the prosecuting witness. Kukis, Karlson, Stenzel and Mrs. Kukis, who is a second cousin of the defendant, corroborated the above testimony of the defendant *in toto,* and gave as their reason for remembering the particular date, that Kukis loaned Stenzel $50 on that night and took a receipt from him for the money, which receipt was offered in evidence but excluded by the court. The defendant was living with Kukis and had been living with him for about eight years, and Stenzel and Karlson had been acquaintances of the defendant and of Kukis and his wife for many years before they came to this country from Russia and had visited one another frequently while they lived in Chicago. The defendant denied in his testimony that Rahn identified him at the hospital as the man who shot him, and also denied seeing Rahn

307—32

at the hospital. He also testified that his teeth had never been affected, and that he did not have any gold filling in his teeth or gold on any of his teeth, and the record shows that he exhibited his teeth to the jury on the trial in confirmation of that testimony. The testimony of the defendant is to the effect that he was not wounded or suffering from any wound or other ailment on and after March 13, 1921, and up to April 12, 1921, and he was corroborated in this by the physician, Awotin, and the other four witnesses aforesaid who testified in his behalf and who saw him on March 14, 1921, and frequently thereafter.

The merits of this case on the competent evidence introduced will not be discussed, as the judgment must be reversed on account of very prejudicial evidence or statements of the police officers and of the assistant State's attorney in the presence of the jury, and which were also incompetent. All evidence of the officers who were guarding the tracks of the Indiana Harbor Belt Railway Company on the night of April 13, 1921, (a month after the commission of the crime in question,) concerning the meeting of the defendant along the side of the cars there at about 11:30 o'clock, his running from the officers, and their shooting him and examining him where he lay in the prairie, was inadmissible and very prejudicial. The occurrences there had absolutely no connection whatever with the commission of the crime of shooting Rahn. If any offense was committed on April 13 it was an entirely distinct offense and which threw no light on the offense charged. The assistant State's attorney, in assuming an attitude before the court and the jury of fairness, made unwarranted statements, which in connection with the evidence and statements of the officers aforesaid, undoubtedly convinced the jury that the defendant had committed a burglary or an attempted burglary on the night of April 13 that was being hidden from them. These statements were the following: "We do not want to prejudice the jury in regard to any other

crime. This one charge is all that we are getting at here. That is all there is on trial to-day." The court here injected this remark, "There is no evidence here of any other crime having been committed," to which the assistant State's attorney replied, "Not here; no, not at this time." In addition to the foregoing prejudicial statements, Scott Dickson, a third police officer who testified in the case, made voluntary statements before the jury that an officer had the defendant in custody for the Federal government while he was in the West Side Hospital being treated for his wounds. Although the whole of the foregoing evidence was finally excluded from the jury, it was of such a prejudicial character that its effect upon the jury could not thus be removed.

The court also erred in permitting the State to introduce in evidence one of the bullets which was claimed to have been fired into the body of Rahn by his assailant and which the evidence shows to be a bullet fired from a 32-caliber gun. This exhibit was not identified as the same bullet that was extracted by the physician from Rahn's back. The physician testified on the trial that he could not identify it as the same bullet that he cut out of Rahn's back; that after he took it out of his back he handed it to a nurse, but he did not give the name of the nurse. The only other evidence concerning the identity of the bullet was given by Rahn, who testified that one of the nurses handed him the bullet and said that it was the bullet that was cut out of his back by the physician, and he did not even give the name of that nurse. Exhibits of this character are not admissible as evidence until they are clearly identified.

The court further committed error in permitting to be introduced the revolver that was found the next morning near where the defendant was lying in the prairie after he had been shot by the officers. This revolver was not shown by competent evidence to be the revolver with which Rahn was shot a month before it was found. Even if it could be said that the proof showed by circumstances

that this was a revolver in the possession of the defendant on the night of April 13, it was not proof of the fact that he had this gun on March 13 and was the gun with which he shot Rahn. The State undertook to prove by the opinion evidence of officer Dickson that this revolver was the identical revolver from which the bullet introduced in evidence was fired on the night Rahn was shot. The State sought to qualify him for such remarkable evidence by having him testify that he had had charge of the inspection of fire-arms for the last five years of their department; that he was a small-arms inspector in the National Guard for a period of nine years, and that he was a sergeant in the service in the field artillery, where the pistol is the only weapon the men have, outside of the large guns or cannon. He was then asked to examine the Colt automatic 32 aforesaid, and gave it as his opinion that the bullet introduced in evidence was fired from the Colt automatic revolver in evidence. He even stated positively that he knew that that bullet came out of the barrel of that revolver, because the rifling marks on the bullet fitted into the rifling of the revolver in question, and that the markings on that particular bullet were peculiar, because they came clear up on the steel of the bullet. There is no evidence in the case by which this officer claims to be an expert that shows that he knew anything about how Colt automatic revolvers are made and how they are rifled. There is no testimony in the record showing that the revolver in question was rifled in a manner different from all others of its model, and we feel very sure that no such evidence could be produced. The evidence of this officer is clearly absurd, besides not being based upon any known rule that would make it admissible. If the real facts were brought out, it would undoubtedly show that all Colt revolvers of the same model and of the same caliber are rifled precisely in the same manner, and the statement that one can know that a certain bullet was fired out of a 32-caliber revolver, when there are hundreds

and perhaps thousands of others rifled in precisely the same manner and of precisely the same character, is preposterous.

There are many instances in which opinion evidence is admissible on the part of both expert and non-expert witnesses. The speed of trains, of automobiles, of horses, values of property, sanity or insanity, intoxication of individuals, physical condition of a person, size and color and weight of objects, and many other such facts, may be shown by opinion evidence when such opinion is based upon proper facts and opportunity of the witness to observe the things or persons and where it is impossible for the witness to detail all pertinent facts in such a manner as to enable the jury to form a conclusion without the opinion of the witness. The general rule that facts, and not conclusions, should be stated is a wise and safe one and cannot be too strictly followed. Mere opportunity does not change an ordinary observer into an expert, and special skill does not entitle a witness to give an opinion when the subject is one where the opinion of an ordinary observer is admissible or where the jury are capable of forming their own conclusions from the pertinent facts susceptible of proof in common form. (Jones' Commentaries on Evidence, secs. 359, 360.) If it were possible in this case to determine whether or not the bullet in question was fired from the gun in question, it must have been by the peculiar rifling or condition of the gun that made what are called the peculiar markings on the bullet aforesaid. If any facts pertaining to the gun and its rifling existed by which such fact could be known, it would have been proper for the witness to have stated such facts and let the jury draw their own conclusions. Under the testimony of this witness, if allowable, the court would have had no alternative except to admit the gun in evidence if the proof had been positive that the bullet in question was the bullet cut out of Rahn's back by the physician. It is stated by Jones on Evidence in the sections above cited, that the general rule that facts, and

not conclusions, should be stated tends to prevent fraud and perjury and is one of the strongest safeguards of personal liberty and private rights, and that whenever it is doubtful whether a case falls under the rule or under one of its exceptions, the wise course is to place it under the rule.

There is evidence in the record to the effect that the history of the gun in question traces it from the Colt Manufacturing Company to the V. L. & A., and that it was then sold to a pawnbroker on Halsted street, in Chicago, and that the pawnbroker sold it to a man by the name of John Johnson, whose address is Twelfth and Puskar streets, and that is what the record of this revolver shows. The State was therefore furnished with a probable opportunity to show that this revolver came into the hands of the defendant through Johnson and his purchasers, if it ever came into the hands of the defendant. It was not admissible in evidence at all until it could be shown, if such is the fact, that the defendant was the owner of this revolver on the night that Rahn was shot. This line of evidence would have been admissible because of the fact that the defendant denied that he was the owner of this revolver or of any other revolver on the night that Rahn was shot. The court therefore committed prejudicial error in admitting in evidence this revolver and all other occurrences concerning the defendant that happened on the night of April 13.

It is also contended that the court erred in refusing to admit the receipt given to John Kukis for the money said to have been borrowed of him on the night of March 13. This receipt was not admissible in evidence under the showing in the record, and the defendant had all the benefit of that transaction that he was entitled to when his witnesses stated that they remembered that particular night by the fact of the giving of this receipt and the date of it.

The judgment of the criminal court is reversed and the cause is remanded.

*Reversed and remanded.*