## CARL H. W. OERTEL *vs.* ETHEL F. OERTEL.

### *Divorce—Cruelty—Evidence.*

The finding of the trial court, which had before it the witnesses themselves, and had therefore a better opportunity than an appellate court can have to estimate the value of their testimony, should not be lightly disturbed. p. 179

Temperamental incompatibility is not a ground for divorce in this State, and a divorce *a mensa et thoro* will be decreed only where the established facts of the case show cruelty of treatment, excessively vicious conduct, abandonment, or desertion. p. 179

That defendant husband stated, in complainant's presence, that she was "nutty" and "feeble-minded," did not constitute cruelty within the meaning of the statute, and does not justify a divorce *a mensa et thoro*. p. 184

In a contested divorce case, the complainant assumes the burden of establishing, by a preponderance of the evidence, the facts relied on to justify the relief prayed. p. 185

Testimony on behalf of the complainant as to physical cruelty on the part of defendant, considered in connection with the testimony in contradiction thereof on behalf of the latter, *held* to be insufficient to meet the burden on complainant of establishing the allegations of her bill by a preponderance of the evidence. pp. 181-185

*Decided February 13th, 1924.*

Appeal from the Circuit Court of Baltimore City, (DUFFY, J.).

Bill by Ethel F. Oertel against Carl H. W. Oertel. From a decree for the plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Horton S. Smith,* for the appellant.

*Albert S. J. Owens* and *Philander B. Briscoe,* with whom were *Briscoe, Jones & Martin* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

Ethel F. Oertel on the 18th day of July, 1923, filed in the Circuit Court of Baltimore City a bill of complaint against Carl H. W. Oertel, her husband, in which she asked that she be divorced *a mensa et thoro* from him; that she have the guardianship of their infant child, and that she be allowed permanent alimony as well as alimony *pendente lite.* This relief she asked on the ground that the defendant had treated her with such vicious cruelty, harshness and brutality that she was afraid to live with him. The defendant answered the bill and denied all of the allegations contained in it, which charged him with cruel, vicious or improper conduct.

Testimony in connection with the issues thus tendered was taken in open court, and at its conclusion the court, on June 5th, 1923, signed a decree divorcing the complainant *a mensa et thoro* from the defendant, awarding her seven dollars per week alimony accounting from the 5th day of June, 1923, but awarding to the defendant the custody and guardianship of their infant child, subject to the right of the mother to have access to it from time to time, and from that decree this appeal was taken.

The only question which it presents for the consideration of this court, is whether all the evidence in the case supporting the appellee's contention is sufficient to justify the act of the lower court in divorcing the complainant *a mensa et thoro* from the defendant. In dealing with that question we are affected by certain statutory mandates as well as by certain obvious legal presumptions. For instance, the statutory law of the State imposes upon the complainant the burden of corroborating her own testimony (Code, art. 35, sec. 4), while on the other hand the fact that the trial court had before it the witnesses who gave the testimony and was able to note the manner in which they testified, their appearance,

their demeanor, their attitude, and the readiness or the hesitation with which they testified, gave him a better opportunity to accurately estimate the value of their testimony than can possibly be had by an appellate court, which is confined to an examination of the cold, dry facts contained in the printed record, and for that reason the finding of the trial court should not be lightly disturbed.

The case records the effort of one party to an unhappy marriage to free herself from the bonds of matrimony, which link together two people neither of whom appears to be wicked or vicious, but who are, according to their testimony, temperamentally unsuited to live together. Temperamental incompatibility, however, is not a ground for divorce in this State, and no matter how desirable it may be as a moral abstraction that two people should be divorced who cannot live happily together, and no matter how injurious it may be to them or to either of them to continue to live together subjected to bonds which have become galling, nevertheless a divorce cannot be granted to either of them unless for causes recognized by the State, speaking through the Legislature, as sufficient for that purpose; and under the laws of this State a divorce *a mensa et thoro* will be decreed only where the established facts of the case show cruelty of treatment, excessively vicious conduct, abandonment or desertion.

After a diligent and very careful examination of the record before us in this case, we have been unable to discover anything in it which could justify this Court in holding that the appellee has met the burden she assumed of showing the existence of any one of those grounds.

The established facts of the case are these: On April 30th, 1919, Ethel Fortenbaugh was married to Carl H. W. Oertel at St. Mark's English Lutheran Church in Baltimore. Oertel is a man of some education. He was born in Germany and educated there, and he received from some German institution a degree which he said was equivalent to a B. A. degree. At the time of his marriage he was employed in a shipbuilding company, later he worked at several drug stores, and eventually established a drug store of

his own which he still conducts. An apt description of his character is found in the appellee's brief, in which he is thus described: "Dr. Oertel is bright and makes a quiet, dependable witness, but it is easy to imagine that he is high-strung and becomes nervous and wrought up at times, as he himself testified on more than one occasion. His self-interest and determination to win out in business is outstanding in the case, and anything that interferes with or blocks this ambition is, in his mind, greatly to be detested."

Mrs. Oertel is not mentally normal. She belongs to what one of the physicians who testified in the case described as the sixty per cent. class; that is to say, her mentality does not exceed the mental grade of sixty per cent. of the people. That rather indefinite expression is taken from the testimony of Dr. Irving J. Spear, who, in defining a term used to indicate her mental state, said: "It means this: that there is a certain average for every person as far as their station in life is concerned, and I judge sixty per cent. of people fall below that." She appears to have been neurasthenic, and had had prior to her marriage a nervous breakdown. While she was devoted to her child, it is rather clear from the evidence that in its early infancy she was unable to properly care for it, and that her attentions to it were, through her inexperience and want of skill, rather detrimental to its health. It cannot, however, be doubted that she had a real love for children, and especially for her own child, but either because of her temperament, inexperience or a lack of training, she could not properly care for it.

Mrs. Oertel inherited from her father an estate valued at approximately $20,000. When her husband was about to establish a drug store of his own he applied to her for a loan of $5,000 to finance his undertaking. He was unable to get that loan from her, either because she was unwilling to lend the money or because the estate was not then in a condition to be settled, but whatever the cause may have been, she said in her testimony that from that time on he began to lose interest in her.

In her bill of complaint she relies upon the defendant's cruelty to her as the basis for the relief prayed.

Her own story of her relations with her husband, if we could accept it as sufficiently proved to comply with the requirements of the law, would undoubtedly establish that charge. She testified that her husband repeatedly struck her, abused her, cursed her, referred to her in a manner that was calculated to humiliate and degrade her, called her "nutty" and "feeble minded," took her child away from her unnecessarily, and subjected her to rules and restrictions upon her conduct which were unnecessarily irritating and annoying to her; by his conduct put her in such fear that she was always apprehensive of bodily injury, and that he continually neglected her, and that, even at the time of the birth of her child, when every principle of decency and humanity would have required him to show her unusual consideration and attention, he neglected her in the most shameful and brutal manner and exposed her to an ordeal which was calculated to shake a mind of the strongest and toughest fibre.

The difficulty, however, is that this story is in conflict with a decided preponderance of the evidence in the case. It would serve no useful purpose to go over that evidence in any detail, and it is sufficient for us to state our conclusions in regard to it. The only corroboration of the complainant's story of her husband's conduct, to be found in the record, is that furnished by the testimony of Mr. Luther M. Willis, Dr. Irving J. Spear, Mrs. Fortenbaugh and Mrs. Plack. Mrs. Oertel in her testimony referred to one occasion when she said her husband attacked her, choked her, cursed her and struck her in the mouth, and left upon her neck the marks of his finger nails. Mr. Luther M. Willis, a member of the bar, testified that she had shown him certain abrasions on the back of her neck which she said were caused by the defendant's finger nails. He had no personal knowledge of the facts, and not unnaturally, after so long a period, did not recall the appearance of the abrasions she had shown him. Her mother, Mrs. Fortenbaugh, said that she had noticed marks on her daughter's neck and that they appeared to be

something like an abrasion, a bruise, like nails or something, a badly bruised neck, and she asked her daughter at the time whether she had a boil coming, and she had said, yes, and that she did not say anything about having received them in a struggle with her husband until after she had left him. In the course of her testimony Mrs. Oertel also said that her husband spoke to her roughly and brutally, called her "nutty" and "feeble minded." In this testimony she was corroborated by Dr. Spear, who said, in speaking of her husband's attitude towards her, that he spoke roughly to his wife in the presence of the witness, and that, quoting him, "he was very unkind to his wife, he made remarks in her presence, which I could not help from listening; he would call her feeble minded and say she had no sense and was unfit to do anything. It was an unkind way to talk before people who are depressed and crying and in difficulty." This witness also testified that in his opinion the nervous condition of the appellee was due to the treatment she had received from her husband, and in reference to that he gave this testimony: "Q. What sort of treatment then did your examination of Mrs. Oertel show that she had received? A. Unkind, inconsiderate, often harsh treatment."

Mrs. Fortenbaugh, Mrs. Oertel's mother, and Mrs. Plack testified that they visited the Oertel home on one occasion and that some difference arose, in the course of which Mr. Oertel said he would "like to get rid of the damn crowd," referring possibly to Mrs. Plack and Mrs. Fortenbaugh.

This is all the corroborating testimony to be found in the case. The allegations of cruelty made by Mrs. Oertel are denied emphatically by the respondent, and he is supported in his denial by the testimony of every other person who appears to have been in position to have known anything of the home life of Mr. and Mrs. Oertel, and many of the specific charges of cruelty made by Mrs. Oertel, when analyzed, are without any substantial support even in her own testimony. For instance, running through her entire story is the complaint that she was physically afraid of her husband and that she feared he would do her bodily harm, and that

that fear arose from his conduct, which made such an apprehension reasonable and natural.   But no one ever saw any marks which could have been caused by any assault upon her except on the occasion testified to by Mr. Willis and Mrs. Fortenbaugh, and in the same struggle in which she received those marks on her neck she testified that she had been struck in the mouth by her husband as hard as he could strike her.   If he did strike her as she alleges, it is incredible that there should be no physical evidence of the blow, and yet while she exhibited the marks on the back of her neck, it does not appear that she ever exhibited any marks showing that she had been struck in the mouth.   So that the only corroboration of the physical attacks upon her is that furnished by her own statements to third persons out of the presence of the appellant.   And again her conduct is inconsistent with her statement that she lived in fear of her husband.   Her husband testified that she came into his store and abused him, talked in a manner calculated to drive his customers away, and quarreled with him.   When asked about that, she gave this testimony:   "Q. Didn't you go in that store and start to quarrel with him?   A. I had reason to.   I had no money and the races were going on and I needed money.   I was using my own.   For two weeks when the races were in town I did without any money from him.   Q. And you would go in the store and make demands on him and did it in a loud tone of voice?   A. Yes, I had reason to.   Q. How many times did you do that?   A. I don't know.   Q. You did it quite frequently?   A. No, when I needed money, and I never had a chance any other time.   Q. Didn't you go into the store and talk to Mr. Oertel in a quarrelsome and loud tone of voice at other times?   A. I did not have a chance to any other time.   Q. And you say you only did it during the two weeks that the races were here?   A. No, I needed money and I was spending my money right along and I think a husband can support his wife. Q. Whenever you wanted money and did not have it you would go in the store and start to quarrel?   A. Not especially in the

store; it has happened in the kitchen.  Q. It was the store I am talking about?  A. Yes, because I needed money and I was not going to spend my money any longer."

That testimony is not consistent with the fear she said she had of her husband.  Another instance of cruelty to which she refers is his inattention to her when her child was born.  But an examination of the very unpleasant and distressing details of her suffering on that occasion fails to convince us that there was any willing fault or conscious neglect on the part of her husband at that time.  He did not know that her child was about to be born, nor did she.  He only knew that she was suffering, and he attempted to get medical assistance, and he himself, whenever he was called on, did what she asked him to do.  Up to that time he had apparently made every reasonable provision for securing the requisite medical attention for her, and he appears to have been as much surprised by the unfortunate turn of events as she was.

While there is no reason to doubt the accuracy of Doctor Spear's statement that the defendant on one occasion said in her presence that she was "nutty" and "feeble minded," that unkind and inconsiderate statement, standing alone, could hardly be regarded as sufficient to justify us in granting a divorce *a mensa et thoro,* and would not constitute cruelty within the meaning of the statute, as construed by this Court.

Nor is her charge that her husband, without justification or necessity, took the care and custody of her child from her and gave it to a trained nurse and prevented her from having access to it, supported by the facts, which show that, while that was done, it was done at the direction of Dr. Ruzicka, who was called upon to treat the child when it was threatened with pneumonia, and who felt that it was essential to the child's recovery that it be placed in charge of a nurse, and that it be taken from the custody and care of its mother.

If the testimony adduced on behalf of the complainant were the only testimony in the case, we should not hesitate to grant the relief prayed, but in a contested case such as this, the complainant necessarily assumes the burden of establishing by a preponderance of the evidence the facts relied upon to justify the relief prayed. *Allen* v. *Allen,* 142 Md. 701; *Goodhues* v. *Goodhues,* 90 Md. 292. And while the evidence to which we have referred, if uncontradicted, would be sufficient to gratify the requirements of the statute, requiring that the testimony of a party to a proceeding for divorce shall be corroborated, it is not sufficient to meet the burden imposed by the law upon the complainant of establishing the allegations of her bill of complaint by a preponderance of the evidence, when it is considered in connection with the testimony offered by the appellant, which contradicts it, and which, measured either by the number of the witnesses familiar with the facts who gave it, or by the character of their testimony, decidedly outweighs that offered by the complainant. We have reached this conclusion with reluctance, because we are persuaded, from an inspection of the record, that the decision reached by the learned judge who tried the case below would have better promoted the welfare of the parties to this cause than that which we have reached in this Court, but we have felt constrained to give effect to what we regard as the settled law of this State, rather than to bend it to meet the exigencies of a particular case, no matter how harshly it may operate.

For the reasons given the decree appealed from will be reversed and the bill of complaint dismissed, the appellant to pay the costs above and below.

> *Decree reversed and bill dismissed; the appellant to pay the costs above and below.*

JUDGE THOMAS and JUDGE PATTISON have examined the case and concur in the above opinion.