RAYMAN W. BORTNER *vs.* J. C. LEIB ET AL.

*Equity—Petition for Rehearing—Receiver—Authority of Corporate Officer—Lending of Credit—Conversion of Securities.*

The refusal of a petition for a rehearing, after a decree, is a matter within the sound discretion of the lower court, and will not be considered by the Court of Appeals when there is nothing on the record to indicate any injustice sustained by the petitioner or any abuse of its power by the court before which the cause was heard.                                    p. 534

After a decree has been enrolled no rehearing can be granted.                                    p. 534

As a general rule, an attorney who represents one of the antagonistic interests should not be appointed sole receiver.    p. 534

An agent's authority being commonly available only for the principal's benefit, the fact that a corporation owned no stock in another corporation, though each of the four stockholders therein did own such stock, was in itself the negation of any grant of power by the former corporation to one of such stockholders, its manager, to bind it for obligations voluntarily incurred by him for the benefit of the other corporation.    p. 537

No agent has implied power to give away any portion of the corporate property or to create a corporate obligation gratuitously, as the property of the corporation belongs to its shareholders, and its use must be confined to the chartered purposes, except by unanimous consent.                                    p. 537

The authority to lend the credit of a corporation, without a consideration, or to sign its name to negotiable paper for the accommodation of others, is usually not implied.        p. 537

One partner cannot, without the consent of the others, bind the firm by lending the firm's credit without consideration, or signing the firm name to negotiable paper for the accommodation of others.                                    p. 537

The power of an agent to bind his principal by endorsing negotiable paper or by pledging his principal's credit for the benefit of a third person may be established by implication, but, if not proved to have been conferred in express terms or to be the result of an estoppel, the delegation of the power must be shown to be necessarily implied from the very nature of the agency created, or to be an actual incident to an established course of dealing.                    pp. 537, 538

The manager of a corporation, the stock in which was owned by him and three others, *held*, on the evidence, not to have authority to bind such corporation by endorsing for accommodation the paper of another corporation, in which all such four stockholders were interested and of which he was a director.

p. 538

The treasurer and active manager of a corporation, in which he was one of the four stockholders, was a fiduciary who had imposed on him the burden of proof completely to account for negotiable warehouse receipts which had been entrusted to him as collateral security for a loan made by the corporation.    p. 545

Where the testimony was taken in open court, so that the chancellor's judgment was informed by the manner and conduct of the witnesses, the appellate court is indisposed to disturb the finding on issues of fact, especially when there is great conflict in the evidence, unless it is apparent that his determination is not supported by the clear weight of the proof.        p. 546

*Decided December 4th, 1924.*

Appeal from the Circuit Court of Baltimore City (DUFFY, J.).

Bill by James C. Leib, Clayton E. Rutledge and Otha L. Gladding against the J. C. Leib Company, Inc., and Rayman W. Bortner. From a decree appointing a receiver for the corporation named, and requiring the said Bortner to pay a sum named to the receiver on account of collateral converted by him, he appeals. Affirmed.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, BOND, and PARKE, JJ.

*J. Edward Tyler,* with whom was *Joseph T. England* on the brief, for the appellant.

*Henry M. Sigel,* with whom were *Sigel & Sigel* on the brief, for the appellees.

PARKE, J., delivered the opinion of the Court.

The bill of complaint was filed on August 30th, 1923, by James C. Leib, Clayton E. Rutledge, and Otha L. Gladding, against the J. C. Leib Company, Inc., a body corporate, and Rayman W. Bortner. The plaintiffs alleged that the capital stock of the corporation was held by the plaintiffs and the defendant, Rayman W. Bortner, and that the corporation was insolvent with a large judgment against it outstanding; that it had not been actively in business since August, 1923, and that the defendant, Rayman W. Bortner, held certain stock of the Aspers Fruit Products Company in his own name, when it was in fact the property of the J. C. Leib Company, Inc. There was a prayer for general relief, and the specific relief sought were a receivership to preserve and liquidate the assets of the insolvent corporation; the transfer by Rayman W. Bortner to the receiver of the stock of the Aspers Fruit Products Company, and an injunction to prevent his disposition of the stock in any form before the transfer was made; and, finally, the distribution of the assets of the corporation and its dissolution.

The allegation in the bill, that gave rise to the controversy below, and this appeal, is the charge that the J. C. Leib Company, Inc., had advanced the sum of ten thousand dollars to the Aspers Fruit Products Company, which had issued its preferred stock in the sum of eight thousand and six hundred dollars, in part payment of this loan, to the defendant, Rayman W. Bortner, who held the stock in his own name when it was, in fact, the property of the J. C. Leib Company, Inc. The lower court appointed a receiver, with power and authority to take charge of the assets of the company, and to collect its outstanding accounts receivable; and enjoined Rayman W. Bortner from making any disposition whatso-

ever of the shares of preferred stock of the Aspers Fruit Products Company then supposed to be held by him in his name in the amount of eight thousand dollars, until the further order of the court.

The answer of Rayman W. Bortner did not admit the allegations of the bill with respect to the company's financial condition, and asserted that the three plaintiffs were largely in the debt of the company. With reference to the advancement by the company to the Aspers Fruit Products Company of the alleged sum of ten thousand dollars, the defendant, Rayman W. Bortner, admitted that advancements had been made, but asserted that these had all been fully adjusted in 1921 between the four stockholders of the company, and that, while he was the holder of preferred stock in the Aspers Fruit Products Company, every share of this stock was his own private property, in which neither the plaintiffs nor the defendant company had the slightest interest. While the answer of the appellant was verified, and was filed on October 1st, 1923, yet the secured preferred stock of the Aspers Fruit Products Company was not held by the appellant, as this stock had stood in the name of his wife since May 5th, 1922, as his gift. A judgment *pro confesso* was obtained against the J. C. Leib Company, Inc., and testimony was taken, and a decree was passed adjudicating the corporation to be insolvent, appointing a permanent receiver to wind up its affairs and declaring that the defendant, Rayman W. Bortner, should pay to the receiver the sum of ten thousand dollars by reason of his fraudulent conversion to his own use of warehouse cider certificates of that value belonging to the said the J. C. Leib Company, Inc. It was through the alleged wrongful conversion by the appellant of these certificates that he obtained the preferred stock in question.

The decree was dated on December 6th, 1923, and on January 8th, 1924, the defendant, Bortner, filed a petition setting forth that he had discovered certain evidence which was not in his possession at the time of the trial of the case, and asking that he be granted a rehearing. This petition was

answered by the plaintiffs, and the lower court passed its order on January 25th, 1924, dismissing the petition.

1.　On January 29th, 1924, the defendant, Rayman W. Bortner, took separate appeals from the decree of December 6th, and the order of January 25th. Consequently there are two appeals on this record. The appeal from the refusal of the lower court to grant a rehearing with leave to offer additional testimony, will not be considered by this Court, as a rehearing, after a decree, is a matter in the sound discretion of the lower court and will not be considered here when there is nothing on the record to indicate any injustice sustained by the petitioner or any abuse of its power by the court before which the cause was heard. *Dorsey* v. *Hammond,* 1 Bland, 463, 473, 474; *Walsh* v. *Smyth,* 3 Bland, 9, 27, 28; *Tessier* v. *Wyse,* 3 Bland, 28, 61; *Meluy* v. *Cooper,* 2 Bland, 200. Furthermore, the decree was enrolled, and no rehearing could have been granted. *Miller's Equity,* sec. 286; Code, art. 16, sec. 188. This leaves for consideration the propriety of the decree appointing a permanent receiver and awarding a judgment of ten thousand dollars *in personam* against the appellant.

2.　So far as the appointment of a permanent receiver is concerned, no point is made by the appellant that requires attention. It is admitted that a receiver should be appointed, and there is nothing before this Court to indicate reversible error in the selection of one of the attorneys for three of the principal stockholders, who, with the appellant, are the chief parties in interest. In this connection, however, it may be said that, as a general rule, it is better practice not to appoint as sole receiver an attorney who represents one of the antagonistic interests. As the naming of the receiver is so largely in the discretion of the circuit courts, they should be careful to choose those who have practical knowledge, experience and sound judgment in the matter involved, and who shall be impartial with respect to the parties affected and the conflicting interests involved. In the course of the receivership, the court is in control, and possesses ample power to remove its

original nominees, and appoint other or additional receivers
as circumstances may, from time to time, require, in safe-
guarding the interests and rights of those concerned. *High
on Receivers,* secs. 65-70, 820-829; *In re Colvin,* 3 Md. Ch.
300; *Williamson* v. *Wilson,* 1 Bland, 418. There is no rea-
son to assume that these principles will not be enforced by
the chancellor to the end of the proceedings in this cause.

3.   The primary matter for the court on this appeal is to
determine from a mass of testimony, largely made up of ir-
reconcilable statements, what is the truth in respect to the
inception, progress, and conclusion of a transaction, whereby
ten thousand dollars passed from the J. C. Leib Company,
Inc., to the Aspers Fruit Products Company. Every essen-
tial fact is a subject of controversy. It is, however, agreed
that for a number of years J. C. Leib carried on in Balti-
more, under the trade name of J. C. Leib Company, the
business of selling fruits and vegetables, and their products,
as a commission merchant. In 1914, he formed a corpora-
tion, called The J. C. Leib Company, Inc., with a capital
stock of thirty thousand dollars; and he transferred his busi-
ness to it, and thereafter the business was conducted as a cor-
porate enterprise. Leib retained control of the corporation,
and became its president. Clayton E. Rutledge, Otha L.
Gladding and Rayman W. Bortner, the appellant, old em-
ployees, were kept, and became, in June, 1921, with Leib,
the holders of all the capital stock. At this time, and until
the filing of the bill of complaint, the respective holdings of
the stock of the incorporation were J. C. Leib, $16,000, Clay-
ton E. Rutledge, $4,000, Otha L. Gladding, $4,000, and
Rayman W. Bortner, $6,000, aggregating the authorized
capital stock of $30,000.

From the beginning, J. C. Leib continued as the president
of the corporation. The management of the corporate affairs
was similar to that of a partnership. Notwithstanding Leib's
large interest, the profits were divided among all the share-
holders, who, with the exception of Leib, were paid salaries.
The business was, in 1921, in the hands of Leib, who was

chiefly consulted with respect to financial matters; of Rutledge, who was the traveling salesman for five or six months of every year, and who was, also, when in Baltimore, a salesman at the docks; of Gladding, who was not in the office but who was chiefly occupied in looking after the affairs of the corporation at Bolton Depot and on the wharfs; and of Bortner, who was the active manager of the corporation, its treasurer, with general charge of the office work and of the books.

Among the business concerns, with which the J. C. Leib Company, Inc., dealt, was the newly formed Aspers Fruit Products Company, a corporation located at Gettysburg, Pennsylvania. In order to make more secure the future patronage of this company, the J. C. Leib Company, Inc., in 1917, 1918, bought $10,000 of its common stock, upon the understanding that it would advance the purchase price of $10,000 for the account of the four stockholders, and would charge the sum of $2,500 against the personal account of each stockholder on the books of the company. This was done and for two years the stock seems to have been in the name of the J. C. Leib Company, Inc., but, at the expiration of that period, every stockholder having paid for his portion of the stock in full to the Leib Company, certificates of stock were issued in the individual names of the four stockholders, and have since been so severally held. Since 1920, therefore, the J. C. Leib Company, Inc., has not held a share of stock in the Aspers Fruit Products Company, and has had no vote in its corporate affairs. The appellant has, however, advanced the theory that, while he was a director of the Aspers Fruit Products Company, he was as such director acting as an agent of the J. C. Leib Company, Inc., and that, therefore, it was bound by his act in becoming the individual accommodation endorser of the Aspers Fruit Products Company, and obliged to indemnify him against any loss personally sustained as one of the seven directors of the Aspers Fruit Products Company, who had endorsed for its accommodation to the extent of some $86,000 or $87,000.

It is clear that an agent's authority is commonly available only for the principal's benefit. So the conceded ownership in severalty by Leib, Gladding, Rutledge and Bortner of $2,500 each in certificates of the common stock of the Aspers Fruit Products Company is of itself a negation of any implied corporate grant of power by the J. C. Leib Company, Inc., to the appellant, to bind it for the obligations of the appellant that were voluntarily incurred in his own individual name and for the relief of a third party. If any benefit indirectly inured from the appellant's endorsement, it was not to the corporation but to Leib, Bortner, Gladding and Rutledge personally as stockholders of the Aspers Fruit Products Company. *Mechem on Agency* (2nd Ed.), sec. 981.

No agent has implied power to give away any portion of the corporate property or to create a corporate obligation gratuitously, as the property of the corporation belongs to its shareholders, and its use must be confined to the chartered purposes, except by unanimous consent. On this practical ground the authority to lend the credit of a corporation without a consideration, or to sign its name to negotiable paper for the accommodation of others, is usually not implied. If the corporation is to be bound, the endorsement must generally have been made with the knowledge and assent of all the directors and stockholders, and the rights of creditors must not be impaired. Even if the corporate form be brushed aside as immaterial, and the relation of the four shareholders be regarded as a partnership, one partner could not so bind the firm without the consent of all its members. *Morawetz on Private Corporations* (2nd Ed.), sec. 423; 3 *Cook on Corporations* (7th Ed.), sec. 774; *Savage Manufacturing Co.* v. *Worthington,* 1 Gill, 284; 1 *Daniel on Negotiable Instruments,* sec. 365; *Navarre Realty Co.* v. *Coale,* 122 Md. 494, 501; *Bear Creek Lumber Co.* v. *Bank,* 120 Md. 566, 569; *Johnson* v. *Johnson Bros.,* 108 Me. 272, 281, 26 Ann. Cas. 1303, 1313 *et seq.; Mechem on Agency* (2nd Ed.), sec. 976; *Johnson & Pitt* v. *Crichton,* 56 Md. 108.

It is true that the dangerous power of an agent to bind his principal by endorsing negotiable paper or by pledging

his principal's credit for the benefit of a third person may be established by implication, but, if not proved to have been conferred in express terms or to be the result of an estoppel, the delegation of this power must be shown to be necessarily implied from the very nature of the agency created, or to be an actual incident to an established course of dealing. *Mechem on Agency* (2nd Ed.), sec. 1001-1003.

The only basis for this contention of the appellant is that, after the purchase of this stock, the Aspers Fruit Products Company requested Leib to join its board of directors in order to watch its affairs. When Leib declined, Bortner was selected as his substitute. The appellant stated in his testimony that he went upon the board of directors of the Aspers Fruit Products Company as the representative of the J. C. Leib Company, Inc., but this assertion is emphatically and categorically denied by the three other stockholders, and there is nothing in the proof sufficient to establish such a relation. There was no written authority ever conferred upon Bortner to use the credit of the corporation as an accommodation endorser. The appellant endorsed in his own name, and told Leib that he was not using the corporate name. No pretense is made that either the corporation, or his associates in the James C. Leib Company, Inc., ever authorized a single one of such endorsements, or ever had one submitted for consideration, approval or ratification, or that anything was ever said or done that could be construed into establishing an agreement of any kind, or creating an estoppel, whereby the James C. Leib Company, Inc., was bound to save harmless the appellant from his independent acts and ill considered use of his own personal credit. In fact, the appellant himself accepted the situation as one in which he could not successfully maintain that his acts as a director of the Aspers Fruit Products Company were the acts of the J. C. Leib Company, Inc. All that he deduced from the situation was a "moral" responsibility of the other three stockholders to indemnify him for his personal endorsement of the paper of the Aspers Fruit Products Company. In speaking of his loss as endorser, the appellant

testified that he said: "Mr. Leib, I felt that I represented the firm in this transaction. If you three insist that I stand this loss, I will have to stand it, but I tell you now, I will not stand it gracefully." This is an unequivocal recognition that neither the corporation nor the three stockholders were under any legal obligation to reimburse the appellant on any of his endorsements.

4. In order to determine the remaining questions on this record, it is necessary to ascertain what occurred in the course of the transaction assailed, and this has required a careful consideration, weighing and review of all the evidence. To set out every conflict of proof resolved would serve no useful purpose. It is, therefore, best to state the conclusion on the testimony in a narrative form, with some discussion of the testimony on the crucial points.

Although the Aspers Fruit Products Company had borrowed heavily on its own and its directors' personal credit, it was nevertheless in urgent need of money, and on June 15th, 1921, appealed for a loan of $10,000 from the J. C. Leib Company, Inc., that was to be secured by the pledge of certain negotiable warehouse receipts for cider in storage in Gettysburg which were worth more than the amount of the loan desired. The four stockholders met and considered the application. Leib, Rutledge and Gladding opposed a loan of $10,000, and the stockholders denied the request, but agreed to a loan of $5,000, with the certificates as collateral. The check for the loan was issued on June 15th.

At the time of the granting of this loan, the J. C. Leib Company, Inc., was not in a good financial condition. In order not to weaken its credit by having the statement to its bank show a loan of its capital to the Aspers Fruit Products Company, it was agreed by the four shareholders that they would personally take the loan in equal parts, so that the capital of their corporation would not be impaired if the Aspers Fruit Products Company should fail to pay the $5,000 loan. For this purpose, the personal account of every one of the four stockholders was to be charged with the sum of $1,250 on the books of the J. C. Leib Company, Inc. If

the Aspers Fruit Products Company paid the note to the lender each of the four stockholders would then be credited with the payment of $1,250.

The financial distress of the borrower soon became acute, and its officers again went to Baltimore, and met Lieb and Bortner on June 23rd, and sought an additional loan of $5,000 on the same collateral. At first Leib opposed the loan, but according to the proof on the part of the appellant, he finally agreed that the loan could be made as proposed, and a check of the lender was made out and delivered on the same day for $5,000.

At the making of this second loan the negotiable warehouse receipts for cider of the value of more than $10,000, which had been pledged as collateral for the first loan of $5,000, remained in the custody of Bortner, treasurer of the lender, as collateral for the first and second loans.

Leib denied that he had either been consulted or had consented to the second loan. While he is contradicted by the witnesses for the appellant, it is established beyond doubt that no meeting of the four stockholders had been held for the purpose of re-considering their recent decision not to extend the credit. Moreover, neither Gladding nor Rutledge was present at the negotiation of the second loan, or had been consulted or informed about it, or had conferred any authority upon Bortner or Leib to make it.

Whatever was the part played by Leib, it is unquestionable that on July 23rd, 1921, the loan to the Aspers Fruit Products Company was fully secured by more than $10,-000 of collateral in the form of negotiable warehouse receipts, which represented cider in cold storage in Gettysburg. These receipts were in the hands of the appellant as treasurer of the lender, and were faithfully kept by him for a period of two or three months.

While Bortner had in his possession as treasurer these negotiable warehouse receipts, Rutledge and Gladding testified that they found out that the loan had been made for the full $10,000, in defiance of the decision of the stockholders on June 15th, and they at once protested to Leib, who as-

serted that he knew nothing of this increase.  Leib and Rut-
ledge stated that they went to Bortner, who informed them
that he had made the additional loan of $5,000, but that their
company held negotiable warehouse receipts for cider to
cover these loans which would enable the company to earn
at least $3,500 in commissions for the sale of the cider.

A few months after the second loan, of June 23rd, 1921,
the Aspers Fruit Products Company was unable to meet its
maturing obligations, and one of the seven directors had re-
fused to continue to endorse at the banks the company's notes
as they fell due.  As the amount of this outstanding paper
was between $86,000 and $87,000, it became necessary for
every one of the directors to take care of between $12,000
and $13,000 of this debt.  Bortner had not paid his share,
and his liability was being carried temporarily by his co-
directors.  In order to avoid bankruptcy, a plan of liquida-
tion was proposed, and finally carried out, whereby the cred-
itors agreed to surrender their accounts, and (a) either to
accept fifty *per centum* of their face value in cash, (b) or to
take seventy *per centum* of their claims in an equivalent
face value of the second preferred stock of that company, and
the remaining thirty *per centum* of the claims in cash.  In
order to accomplish this, it became necessary for the directors
each to pay in $9,000, amounting to $63,000 for the seven
directors, and to release their thirty *per centum* distributive
share in cash on their claims as creditors of the company
and to take the preferred stock.  By this means, the neces-
sary funds to pay the company's indebtedness of $86,000 or
$87,000 to the banks were procured.  In consideration of
severally contributing $9,000 for this purpose, each director
was released of a liability as endorser for the company of
between $12,000 and $13,000, and each was to receive one
hundred and seventy-two shares of the second preferred
stock of the company, with a face value of $8,600, but with
a then sale value of but $2,580.

The failure of Bortner to pay his $9,000 in cash would
destroy this plan.  If these negotiable warehouse receipts of
a value of at least $10,000 could be obtained, the cider

could be sold, and the proceeds could take care of Bortner's individual liability of $9,000.

Accordingly Aspers, the president, and Butt, the vice-president, of the Aspers Fruit Products Company, went to Baltimore, where Aspers and Bortner state they and Butt met Leib and submitted the scheme that Bortner should surrender all of the pledged negotiable warehouse receipts for the purpose of taking care of Bortner's $9,000 liability; that the J. C. Leib Company, Inc., should (a) release $9,000 of the $10,000 loan of the Aspers Fruit Products Company with the J. C. Leib Company, Inc., and (b) should transfer $9,000 of the loan of the Aspers Fruit Products Company to a charge of a like sum against Rayman Bortner's personal account on the books of the J. C. Leib Company, Inc., and (c) should allow the remaining $1,000 of the loan to the Aspers Fruit Products Company to stand as an advance against cider which was in cold storage in Baltimore, and which was then being offered for sale by the J. C. Leib Company, Inc.

The only excuse for this extraordinary proposal, whereby the corporate assets were to be applied to the prejudice of creditors and shareholders, without any consideration therefor, to the payment of the private debt of the appellant, was that there was a moral obligation on the part of the J. C. Leib Company, Inc., to reimburse the appellant because he had become a director in the Aspers Fruit Products Company at its instance. It is needless to say that the law does not suffer the rights of creditors to be impaired by the diversion of corporate property to pay the private debt of its officer, even with the consent of *all* the shareholders. *Supra.*

Without the authority, knowledge or acquiescence of Rutledge and Gladding, the appellant delivered these pledged negotiable warehouse receipts to the Aspers Fruit Products Company, which sold the cider represented by the receipts, and applied the proceeds to the discharge of its obligations and of the appellant's as its accommodation endorser. The appellant conceded that he had no power to make this deliv-

ery from any authorization of either the J. C. Leib Company, Inc., or of Rutledge or of Gladding. With respect to Leib, the appellant said that, in a conversation among Leib, Aspers and himself, Leib "did not object to the surrender of the certificates and I took it for granted then it was all right to release these certificates because I was assuming the $9,000 obligation for which I was to settle later." Aspers corroborated Bortner but Leib denied either having made this statement, or having been present at this conversation, or having ever sanctioned the surrender of these receipts.

When it was discovered by Rutledge and Gladding that the negotiable warehouse receipts of a value then in excess of $10,000 had been appropriated by the appellant for his own personal benefit and that of the Aspers Fruit Products Company, and that the debt of that company to the extent of $9,000 had been extinguished, a crisis was produced in the affairs of the J. C. Leib Company, Inc. After a short period of unrest, during which Bortner admitted that Rutledge and Gladding consistently maintained that their company was not responsible for Bortner's losses in the Aspers Fruit Products Company, the appellant testified that he brought the controversy to a head at a meeting of the four stockholders, where it was agreed that the corporation would stand $5,000 of the loss, and the appellant $4,000, with the right to the appellant to get all that the Aspers Fruit Products Company would pay on account of its obligations to Bortner as one of its creditors on account of his responsibility as one of its accommodation endorsers. The witness further asserted that the amount of $9,000 was to be charged on the books of the company against the personal account of each of the stockholders, and that accordingly he entered a charge of $1,250 against each of his co-stockholders, and $5,250 against himself, which was his proportion ($1,250) of the loss assumed by the corporation and the amount ($4,000) personally to be assumed by him.

This understanding is said to have been reached on September 5th, 1921, and the only other persons present were

the two women clerks, who said they were in the office on
that day, but neither could recall hearing the conversation
narrated by the appellant. The books were kept by the ap-
pellant, and were in his control, and the entries there made
were by him in his own handwriting, so they are in the
nature of self-serving declarations, and do not possess any
positive evidential value, especially in view of the obvious
and admitted alterations made in the entries of the amounts
of the charge against the appellant, who offered no convinc-
ing explanation of their two successive changes. In fact, the
only corroboration is found in the testimony of Aspers, who
swore that, some time about the close of 1921 or the first part
of 1922, he was in Baltimore and had a conference with J.
C. Leib in reference to the adjustment of a claim of J. C.
Leib Company, Inc., against the Aspers Fruit Products Com-
pany on an open account of $2,281.50 and that in the course
of their talk, Aspers asserted that Leib had said that he felt
that the corporation should stand $5,000 of that obligation
and Bortner $4,000, for which he would receive the $8,600
of second preferred stock of the Aspers Fruit Products Com-
pany and would get the benefit of whatever he would make
out of it.

The Aspers Fruit Products Company had, with knowl-
edge, received the full benefit of the appropriation by Bort-
ner of the warehouse receipts, and had also been relieved
thereby of its indebtedness to the J. C. Leib Company, Inc.,
to the extent of $9,000. So the testimony of its president
cannot be given the weight of a disinterested witness, and
he is flatly contradicted by Leib. Furthermore, Leib, Glad-
ding and Rutledge denied that the agreement narrated by
Bortner had ever been made or contemplated.

In November, 1921, the Aspers Fruit Products Company
issued and delivered to appellant a certificate for $8,600 of
its second preferred stock, which was worth about thirty
cents on the dollar, and later on advanced to sixty or eighty
cents on the dollar. At the time of the filing of the bill of
complaint, this stock was believed to be in the name of the

appellant, and the bill was prepared on that theory, but, although the appellant's verified answer asserted that this stock was his own individual property, the evidence established that the appellant had transferred it as a gift to his wife on May 5th, 1922, which was twenty days after his marriage.

The record permits but one deduction. The appellant himself admitted that the loan of $10,000 by the J. C. Leib Company, Inc., was an extraordinary transaction, and certainly, his surrender and use of the negotiable warehouse receipts are none the less remarkable. He made no pretense that Gladding or Rutledge participated in, or authorized the delivery of, these receipts. He failed to show any express or implied power delegated to himself or to Leib warranting his act, and Leib denied all knowledge of conversion of the securities. He produced no corporate action, no common determination of the four stockholders, empowering, consenting to, or ratifying his conduct. In the absence of anything to make it credible, he asked the lower court to believe that a failing corporation would surrender at least $10,000 of pledged marketable negotiable warehouse receipts, and would also forgive $9,000 of a $10,000 debt, and would accept the substitution of the precarious obligation of entries on the personal account of its own shareholders of a book charge against Bortner of $5,250, and of $1,250 against every one of the remaining three parties in interest, Leib, Gladding and Rutledge. Such a rash course involved an impairment of the liquid capital, when financially embarrassed, to the extent of $10,000, a personal loss by Leib, Gladding and Rutledge of $1,250 each, and the present receivership.

The appellant was the associate in business of the other three shareholders, the treasurer of the corporation and its active manager, and, until the additional loan was made, had enjoyed their confidence. By reason of his official position and of his relation to the other stockholders, he was a fiduciary who had imposed upon him the burden of proof completely to account for the negotiable warehouse receipts which had been entrusted to him as collateral security for

the corporate loan of $10,000. *Acker, Merrall & Condit Co.
v. McGaw,* 106 Md. 536, 556, 557; *Macgill* v. *Macgill,* 135
Md. 584, 593, 594. The crucial test of the adequate dis-
charge of this burden was his ability to prove his account of
what he alleged had been agreed upon by the corporate stock-
holders on September 5th. The experienced chancellor be-
low, after an extended investigation and careful considera-
tion, came to the conclusion that the appellant had failed in
his proof. The testimony was taken in open court, where the
judge had an opportunity to see the witnesses, to hear their
evidence fresh from their lips, and to observe their expres-
sion and demeanor, so that, in weighing the testimony and
passing on its credibility, his judgment was informed by the
manner and conduct of the witnesses while testifying. The
appellate court does not enjoy this advantage, and it has,
therefore, no inclination to disturb the finding of the chan-
cellor on issues of fact, especially when there is so much con-
flict in evidence, unless it be apparent that his determination
is not supported by the clear weight of the proof. The court,
moreover, is convinced that this cause is an illustration of
that class of reprobated instances where a trusted officer of
a private corporation has misused his position by appropriat-
ing the corporate property to the discharge of his private
debts, and that the decree for the value of the converted prop-
erty was demanded by the proof.

(5) The appellant has urged as a ground of reversal that
the chancellor did not give the appellant credit for a pay-
ment of $4,000 on account of the conversion of the ware-
house receipts, and for $899.39 collected by the J. C. Leib
Company, Inc., from the sale of the cider which appellant
alleged was pledged as collateral for the residue of $1,000
on the original loan. The contention with respect to the first
item of $4,000 is based on appellant's testimony to the effect
that he had paid to the J. C. Leib Company, Inc., on account
of the $4,000, which he swore he assumed as his personal
loss, the sum of $4,654.12, less a withdrawal of $500, but
this amount was duly credited by himself on his personal

account, which, at the time of the severance of his connection with the J. C. Leib Company, Inc., showed him indebted to his company in the sum of $5,288.09 by his own figures. As there is included in this sum the charge of $5,250 on account of the Aspers stock, a deduction of the whole charge would still leave the appellant indebted to the extent of $38.59 on this account in addition to the value of the warehouse receipts. Nor can credit be claimed for the proceeds of cider sold for the account of the Aspers Fruit Products Company, as it was not available for that purpose. The appellant himself had opened a special account of his company's transactions with the Aspers Fruit Products Company, and, among the credits given on that account, is the one for $899.39, leaving the Aspers Fruit Products Company indebted to the J. C. Leib Company, Inc., in the sum of $2,281.50.

Under the authorities cited and for the reasons assigned, we concur in the conclusion of the court below, and the decree will be affirmed.

*Decree affirmed, with costs to the appellees.*