OLIVIA SWANN HAMPSON ET AL. *v.* THOMAS W. BRUNDIGE, JR., ADMINISTRATOR, ET AL.

ALFRED TUDOR ET AL. *v.* THOMAS W. BRUNDIGE, JR., ADMINISTRATOR, ET AL.

[Nos. 66, 67, October Term, 1934.]

*Decided January 16, 1935.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Albert F. Wheltle,* with whom were *Julius A. Victor, Jr.,* and *Harley & Wheltle & Webster,* on the brief, for the appellants in No. 66.

*Howard A. Sweeten,* with whom were *Weinberg & Sweeten* on the brief, for the appellants in No. 67.

*J. Maulsby Smith,* for the appellees.

PARKE, J., delivered the opinion of the Court.

The intestate, Sarah Matilda Tudor, died on March 18th, 1933, unmarried and without issue. Her estate embraced both realty and personalty of the estimated value of from $50,000 to $55,000. Letters of administration were granted upon her personal estate, and the administrator petitioned the Orphans' Court of Baltimore City to appoint a day for distribution or payment to the parties entitled, pursuant to the provisions of section 148 of article 93 of the Code. After notice was given of the day, a number of claimants appeared and asserted the right to a distributive share. The brothers and sisters of the intestate were dead without issue, and her next of kin were her cousins. The controversy on the record at bar is: Who are her cousins?

There are a number of contestants, but they fall into

two major groups, one of which are the second cousins, who are the lineal descendants of John Tudor, the grandfather of these cousins and the uncle of the intestate. The common ancestor of this group and the intestate is Sarah Tudor, who was born in 1764 and died on September 9th, 1859. The second major group are the cousins who claim as the descendants of William Linthwaite Tudor, the second, who was born in 1821 and died in 1891, and was the father and grandfather of these cousins and the alleged uncle of the intestate. The ancestor claimed for this group is William Linthwaite Tudor, the first, who is said to have been born in 1773 and died in 1858. The second major group is divided into two classes, because it is asserted that the second William Linthwaite Tudor was married twice, and that by the first wife, Elizabeth Ann Miller Tudor, he had five children, all of whom are now dead, and of these, but three left descendants, who are the great grandchildren of William Linthwaite Tudor, the first, and constitute the first class of the second group. Mary Catherine Tudor is asserted to be the second wife of William Linthwaite Tudor, the second, and by her he had five children, who are now living and who are the grandchildren of William Linthwaite Tudor, the first, and so the alleged first cousins of the intestate. If these descendants are first cousins, they are the intestate's only first cousins, and, therefore, being one degree nearer in kinship than any other living relatives at the time of the intestate's death, this second class of the second group would take to the exclusion of all others. The point is made against this second class that their parents were not married, but that point is not necessary to be decided unless Henry Clinton Tudor, the father of the intestate, and William Linthwaite Tudor, the second, have a common ancestor. This was the chief issue tried before the three judges of the Orphans Court of Baltimore City, and two of them (Gaither, C. J., and Sykes, J.) agreed and decided that the second cousins constituting the first group were the next of kin of the intestate to the exclusion of the claimants who composed the second group. One of

the judges (Dunn, J.) did not concur in this decision, and dissented on the ground that the testimony had established that the claimants who formed the second class of group two were legitimate and the only next of kin of the intestate.

The effect of this decision is to limit the children of the common ancestor to three, John Tudor, Sarah Tudor (no issue), and Henry Clinton Tudor, and thus to exclude Robert F. of L. Tudor (no issue) and William Linthwaite Tudor and Mary Linthwaite Tudor, who, the appellants claim, had the same common ancestor.

There were many witnesses produced and the record is so lengthly as to preclude any attempt to state the testimony. An exhaustive review of the record has produced the conviction that Sarah Tudor was the common ancestor of the intestate and of the six second cousins whom the majority of the judges of the Orphans' Court found were her next of kin and, therefore, entitled to share in the distribution of her estate.

The successful claimants in group one were unable to prove the marriage of Sarah Tudor, nor could they establish the name of her putative husband. They traced their pedigree to their great-grandmother, Sarah Tudor, the mother of John Tudor, their common grandfather, and the mother of Henry Clinton Tudor, the father of the intestate, and their great-uncle. The other claimants, however, maintain that the husband of Sarah Tudor was William Linthwaite Tudor, whom they distinguish as the first, and his son of like name as the second. No direct nor documentary proof of marriage between Sarah Tudor and William Linthwaite Tudor was given by these claimants, who attempt to establish the fact of marriage by the existence of a relationship of brother and sister among Sarah Tudor (no issue) and John Tudor and Henry Clinton Tudor, under which two the second cousins of the first group claim, and Robert F. of L. Tudor (no issue) and Mary Linthwaite Tudor and William Linthwaite Tudor, under which last two the first and second cousins of the second group claim. Testimony was of-

fered in the form of declarations which tended to prove the relationship was asserted and recognized, and this testimony, if believed, would have the effect of establishing the relationship which the claimants in the second group maintain existed. The testimony on the part of the other claimants is in denial of this pretension, and this denial finds support in the circumstances that there is no documentary evidence of any kinship between the two groups, no correspondence, intimacy, nor such social contact between the members of the two groups as is usual in any such close relation, and no attendance shown at marriages and burials, although both families have lived in Baltimore or its vicinity for three generations. It is true that there is testimony on the part of several of the rejected claimants to the effect that there were some visits made by several members of the second and third generations, but these visits are testified to by claimants who were children at the time, and whose accuracy of recollection is affected by the passage of time and by pecuniary interest, and is impugned by the absence of any subsequent intercourse or presence at even the ceremonial rituals of marriage and burial.

The spelling of the last syllable of the surname Tudor with an "e" is a variation of no great importance, and occurs in the ancestral lines of both groups; but, because of the phonetic difference, there is some significance in the fact that the first group have consistently spelled the surname "Tudor" or "Tuder" in every generation, while the ancestor of the second group spelled his name "Toder," as is shown by the deed to him as William Linthwaite Toder, bearing date of November 9th, 1824, conveying certain land in trust for the use of his two sons, "Robert Fields Toder and William Fields Toder." The entry of the birth and marriage of his daughter uses "Mary Toder." And when William Linthwaite Tudor, the first, died, at the age of eighty-five years, he was buried on October 8, 1858, under the name of William Toder, as is shown by the records of the cemetery company. Sarah Tudor, the ancestress of group one, died

on September 9th, 1859, at the age of ninety-five years. Although this was less than a year after the death of William Toder, she was not buried in his lot in the cemetery, which would have been her natural and customary burial place, if she had, in fact, been his wife. Another circumstance to be noted is that the family names carried from generation to generation are different in the two groups. In the first group it is "Clinton"; but in the second it is "Fields" or "Linthwaite"; but in neither family group does the family name used with the given name appear in the other group.

In addition, the testimony in support of the order of the orphans' court is of greater intrinsic weight than that offered by the claimants in group two, whose witnesses did not testify with the same clarity and spontaneity. Some of their witnesses were positive when the nature of their statements or their sources of information were inherently doubtful, and others were vague and confused. Much of their testimony was drawn out by suggestive and leading questions, which are especially objectionable when the question is one of pedigree and the testimony to be given is hearsay and admissible because other and better evidence is generally unobtainable. *Wigmore on Evidence* (2nd Ed.) secs. 1481, 1482; *Craufurd v. Blackburn,* 17 Md. 54. Testimony so elicited, particularly with reference to remote conversations or events, when the witness was immature or quite young, does not possess much intrinsic probative force.

The record presents questions whose correct solution depends upon a just evaluation of conflicting testimony on the part of a large number of witnesses. The value of the testimony depends upon its truth, and the contradictions in the testimony arise in this case almost exclusively on the parol evidence with respect to declarations made many years ago. In ascertaining the truth, in this conflict, of oral testimony, the demeanor of the witnesses on the stand, their mental reaction to questions, as reflected in their countenance and conduct, and the nature and manner of their answers, are of great aid in determining

the credibility of testimony and the relative weight it should be given. Since these criteria were available to the members of the tribunal before whom the witnesses appeared and testified, but were, in large measure, lost in the reduction of the spoken word to their written record, the full evidential value of the oral testimony of a witness that the trial court had is not transmissible to the appellate court. For this reason, effect will be given to the findings of fact by the trial court, when there is conflict of testimony, unless it be apparent that the finding is not supported by the clear weight of the proof. *Oertel v. Oertel,* 145 Md. 177, 178, 179, 125 A. 545; *Bortner v. Leib,* 146 Md. 530, 546, 126 A. 890.

The court has considered all the testimony on the record, and its conclusion makes it unnecessary to consider the motion on the part of the appellees to strike out much of the testimony offered by the appellants. It may be stated, however, that motions to strike out testimony, which has been received subject to exception, must designate specifically the particular testimony whose exclusion is sought. A simple and advisable method is for the question and answer to be numbered, and the motion to strike out to identify the testimony objected to by a reference to the name of the witness and the number of the question and answer.

*Order affirmed, with costs.*