## HOLCOMB ET AL. *v.* FENDER
## (Three Appeals in One Record)

[No. 52, October Term, 1953.]

*Decided January 8, 1954.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*J. Wilmer Cronin,* with whom was *J. Paul Cronin* on the brief, for the appellants.

*Harry St. A. O'Neill* and *Charles Gilbert Cooley* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The Circuit Court for Harford County determined that the appellee, W. Glenn Fender, was entitled to a mechanics lien against three houses which he had built for the respective owners, two brothers and a sister, and their spouses, who are the appellants. From its decree declaring the indebtedness of each owner to the builder for the balance found by the Chancellor to be due and unpaid on the houses involved, and establishing the existence of a lien to secure payment, this appeal is taken. No questions are raised as to procedure or matters of form.

The appellants make two contentions, the answers to which control the case. First, they say that for each house there was a contract for a fixed sum, or, at least, a set ceiling price and that the lien is allowed improperly because the cost of the houses exceeded the agreed amount. Second, they assert that the testimony produced does not reasonably permit a finding that all of the materials charged for were delivered to the site and went into the houses.

The builder first discussed the erection of a house at a time when Raymond Howard Morris, one of the appellants, had entered into a contract to purchase a prefabricated house. The initial discussion was whether Fender would erect the house. Morris previously had been given an estimate of $6,175.00 for the house erected, but without a basement. In the course of the first discussion on the subject, Fender said he could build them a better house and save them some money. Finally, Morris agreed to have Fender build a house for him from plans procured from a lumber company. Thereafter, the two brothers-in-law of Morris, Glenn Holcomb and Gene Holcomb, arranged for Fender to build houses for them. Two were substantially the same and the third had a garage, which was first used as living quarters, and a breeze-way. Grimes Holcomb, the father of Gene and Glenn and of Mrs. Morris, was to advance

the cost of the houses for his children. He procured a loan for them from a local bank, which he guaranteed, and each paid Fender $6,000.00 when the houses were partially completed. When the houses were complete, Fender billed the owners and Mr. Grimes Holcomb for additional amounts on each for labor and material, claiming that the $6,000.00 paid by each was only part payment. The bills being unpaid, he filed mechanics liens against each of the properties, claiming a balance due from Glenn Holcomb of $4,433.24; from Gene Holcomb of $2,395.27; and from Morris, of $2,395.27. The Chancellor, after hearing, disallowed a ten per cent builder's commission on the finding that Fender had expressly agreed to accept a discount from the lumber man in lieu of his commission, and reduced the unpaid balance due by Glen Holcomb in the amount of $938.20, and that due by the other two by $718.84 each.

The Chancellor found that there was no contract to build any house for any specific sum. Each of the owners, in answer to direct and explicit questions from the Court, admitted that this was so. Some thought that each house was to cost not more than $6,000.00; others, not more than $6,100.00; and others, not more than $6,175.00. The Chancellor said in his opinion: "A contract to build a house is not different from any other contract. To be enforceable, it must be definite and certain in its terms. Surely the testimony offered by the owners in support of their position in this matter is indefinite and lacking in many of the essential particulars necessary to establish a binding contract. It seems clear to me that, in the conferences between the owners and the builder preceding the actual building operations, some discussions as to the probable costs took place; and it may well be that the owners believed that a ceiling cost was established. Yet such a belief could become binding on the builder only when and if he agreed to it; but I find no adequate support for that proposition in the testimony. The statements attributed to the builder seem to me at most to be estimates."

We think there is ample support in the record for the finding of the Chancellor.

No plans or specifications for the prefabricated houses were produced and it is undisputed that the houses which were built were different, and in some respects, larger and more complete than the prefabricated house. The appellants, or their wives, in some cases, personally selected various items of materials which were to go into the houses, choosing in each case the most expensive and best kinds available. If the builder had been working under a ceiling, it is unlikely he would have acquiesced in this procedure. Several of the owners, when questioned by the Court as to what would have happened if the cost had been less than $6,000.00, were unable to say. One answered as to the supposition: "I guess I thought,—I suppose we were to get it, but at that time no one even thought of it." An owner ordinarily does not pay the full price of a house long before it is finished. There was also in the record testimony that when Grimes Holcomb (the father, who participated in many of the discussions and was as familiar with the understanding and agreement as any of his children) received the bills for the additional sums claimed to be due, he made no protest that there was to be a ceiling but rather, requested the representative of the lumber company to go over the bills with him so that he could be sure that all of the material had been delivered and charged for at the proper rate. He was concerned only with being sure that he was responsible for the amounts claimed.

In an effort to show that all of the materials charged for did not go into the house, the appellants produced a witness who had had experience with a lumber company for some years as an estimator of the cost of building and of the cost of material which would go into them. He had examined the houses and plans and testified that his estimate of the cost of construction would be $6,000.00. He estimated that by figuring cubic footage and applying a cost of construction per cubic

foot which he thought was accurate. Upon cross-examination, he revealed that he had estimated the cost of the houses at what they would have cost to build in 1947, which was the year in which his experience in that line of work had ceased. He also testified that from his measurements of one of the houses, he believed that there should have been used some thirteen hundred lineal feet of two by fours in one of the houses. The bills for the material, which were filed, showed that substantially more footage had been used in the house. The effect of this type of testimony is discussed in the case of *Dente v. Bullis*, 196 Md. 238. There, there were several expert witnesses who testified as to the proper ratio between labor costs and costs of raw material, and who estimated the material used. The Court said: "Bullis built the house and the only testimony to contradict his statement as to time and material consists of abstract calculations based on the ratio between time and material, and testimony of persons who examined the house after it was built and calculated what it should have cost." The reasoning of the Court in that case applies with full force in the present case. The appellee, W. Glenn Fender, testified flatly that all of the materials charged for had gone into the house, all of the labor charged for had worked on the house, and that the prices and rates were reasonable. His son, Robert Fender, who was on the job most of the time gave full corroboration, stating that he had signed many of the tickets. An employee of the lumber company which furnished the lumber, and who was familiar with the building operation as it went forward, gave detailed support to the testimony of the Fenders and said that all of the material charged for had been delivered to the job. It was shown that where there was surplus lumber, it was returned and credit given by the lumber company. In one instance, the son, Robert Fender, purchased some lumber for use in his own house, by express agreement with one of the owners. The Chancellor's finding was: "I think it has been satis-

factorily shown by the testimony of Mr. Fender and Mr. Lytle that the materials charged for in the mechanic's lien claims were delivered and used in the construction of these properties, and that the prices charged for were fair. I also think that the items for labor were satisfactorily shown to have been performed on these properties. The scale of wages is not disputed, and the only witness on this subject presented by the owners (Mr. Sample) stated, after an inspection of the time books, that the rate of pay was proper." The court, in *Dente v. Bullis, supra,* said on this point: "As we have observed in many equity cases, the chancellor here had the opportunity to see the witnesses, to hear their testimony, to observe their expression and demeanor while on the stand. This Court does not have that advantage. Therefore it is not inclined to disturb the chancellor's findings on issues of fact. The appellee built the house and furnished the labor and materials necessary. He has filed a sworn statement as to the amount of each. We have nothing to contradict this testimony except mere estimates and abstract calculations. We see no reason to disturb the finding of the chancellor as to the amount due the appellee."

There is the further fact, as we have noted, that the lumber company representative went over all of the tickets with Grimes Holcomb and explained to him how the various items had been used in the houses and verified the types of the materials, the amounts used, and the prices. Under the holdings of this Court in *Dente v. Bullis, supra,* and *District Heights Apartments v. Noland Co. Inc.,* 202 Md. 43, we see no reason why the Chancellor was not justified in making the findings he did.

After the case had been decided, the appellants filed a timely petition under the provisions of General Equity Rule 50, Section 220 of Article 16 of the Code of 1951. In it they alleged under oath that since the hearing of the testimony: ". . . your petitioners have learned that there are serious and apparently fraudulent errors

in the accounts filed in this Court to support respondent's alleged mechanic's liens, . . ." The prayers of the petition were that the decree be revised or stricken out and further proceedings heard, and that the date for the enforcement of the lien be extended or stricken out. Attached to the petition were estimates, under oath, of the same witness who testified for the appellants as to the cost of construction and estimates of material used and other items, which went into the houses, similar to his testimony as to the two by fours. The Chancellor refused the relief prayed in the petition. In their brief, the appellants say that they recognize: ". . . that such evidence could have and should have been presented at the trial, . . ." but excuse its absence on the ground that the witness who had been expected to give it, had been prevented from preparing his testimony by his business activities.

It is well recognized that the granting or refusal of a rehearing is in the discretion of the Court, and no appeal lies from its action unless there is a showing of injustice to the petitioner or an abuse of power by the lower court. *Hancock v. Stull*, 199 Md. 434, 436; *Bailey v. Bailey*, 186 Md. 76; and *Bortner v. Leib*, 146 Md. 530. We see no indication of injustice to the appellants or an abuse of power by the Court in the refusal of the Chancellor to grant the relief prayed.

*Decree affirmed, with costs.*