HARFORD METAL PRODUCTS CORPORATION *v.* TIDEWATER EXPRESS LINES, INC.

[No. 35, January Term, 1944.]

*Decided March 24, 1944.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, and BAILEY, JJ.

*Lee I. Hecht* and *Isaac Hecht* for the appellant.

*J. Wilmer Cronin* for the appellee.

MARBURY, J., delivered the opinion of the Court.

This is a suit in replevin brought in the Circuit Court for Harford County by the appellee, a common carrier, against the appellant to recover an automatic screw machine valued at $3,600. The appellant filed pleas of *non cepit*, property in itself, and no property in the appellee. The case was heard before the court sitting without a jury. At the close of the case, prayers were offered, which the court passed upon, and then gave an oral opinion, entering a verdict in favor of the plaintiff for the return of the property and one cent damages and costs. On this verdict a judgment absolute was entered, and from that judgment this appeal was taken.

It may be noted, in order to avoid some confusion seeming to exist in the trial courts, that under Trial Rule 9 of Part 3 of the General Rules of Practice and Procedure of this court, which has to do with cases tried before the court without a jury, no prayers or requests for instructions are required, and no exceptions to such instructions are necessary. It is not improper to offer prayers, in order to present to the court distinctly the issues of law which the parties wish considered, but when such a case comes here on appeal, it is heard according to the practice in equity. We review both the law and the evidence, and determine, from the whole case, whether the trial court is correct in its interpretation of the law. We do not pass specifically upon prayers in

such cases, and prayers are unnecessary for purposes of review. Their value in such cases, if they have any, is only as a method of letting the trial court know the respective contentions of the parties.

There is little, if any, dispute in the record about the facts in this case. The appellant, a corporation engaged in the manufacture of airplane parts, purchased from the Triplex Machine Tool Company the Swiss type automatic screw machine in controversy here for the sum of $5,200, of which one-third was paid in cash with the order. The balance was to be paid on delivery. The machine was shipped on account of the Triplex Company from Dayton, Ohio, through the Universal Car Loading and Distributing Company and the appellee, the Tidewater Express Lines, Inc., to the order of Triplex with instructions to notify the appellant at Aberdeen, Maryland. The delivery receipt of the Universal Car Loading and Distributing Company, the originating carrier, was introduced in evidence. It contained a statement, "Del Only on Surr Orig B/L Propend," which is interpreted to mean, Deliver only on surrender original bill of lading properly endorsed. The original bill of lading was sent through the Federal Reserve Bank to the First National Bank of Aberdeen with a sight draft for $3,535 on the appellant. Had the transaction gone through as planned, the appellant would have taken up the draft, gotten the original bill of lading, presented it to the appellee when the machine was brought to appellant's place of business, and there would have been a complete settlement and delivery. This, however, was not the way it happened.

The appellee, hereinafter called Tidewater, received the shipment on June 1, 1943, and its general manager testified that when its clerk wrote up Tidewater's way bill, through an error, he left off the notation, above quoted, for delivery on surrender of the bill of lading. When Tidewater's driver delivered the machine on June 2, 1943, he did not get the original bill of lading. At that time, there had arisen some dispute about the machine between appellant and Triplex, and appellant had de-

clined to pay the draft, had not, of course, gotten the bill of lading from the bank, and at first refused to accept the machine from the driver, but finally, on the latter's insistence, did so, and paid the shipping charges. Thereafter a number of telephone calls and telegrams were made by the appellant to Triplex, and finally on June 26th, the president of appellant told Triplex that the machine would not be paid for, unless Triplex lived up to its agreement to send its set-up men to operate the machine. On June 28th, the president of appellant sent Triplex a trade-acceptance, due in two weeks, and stated in his letter that two weeks would be plenty of time to have the machine in operation, and when Triplex did get it in operation the appellant would pay the balance due. This trade-acceptance was for $3,535 and was to be paid on July 12th. A letter was received by the appellant by return mail from Triplex thanking it for the trade-acceptance, and stating that if the appellant would bear with it for just another short period of time, it might rest assured that in the near future its three screw machines (there were two others the appellant had previously gotten) would be humming day and night to its complete satisfaction. About the middle of July, Triplex's Mr. Grano, who was to service these machines, came to appellant's place of business to get the machines started. The trade-acceptance had not been paid because this visit had not been made before the time it was due, although Triplex had sent it to a Maryland bank for collection. Just before the Triplex man arrived, the appellant received a letter from Triplex making a suggestion as to the financial end of the situation. Triplex's men were to come to Aberdeen the following week, fix the machines so that they would run satisfactorily, then a spindle attachment was to be put on one of the machines, and it was to be demonstrated by the Triplex operators. When this had been done, the Triplex man would present the protested trade-acceptance and the appellant would pay it. Appellant's president testified that after receipt of this letter the Triplex men came

to the plant, but were unable to make the machines operate properly, and his company did not pay, because the machines were not operating. On July 28th appellant telegraphed Triplex asking what disposition it wanted made of the two machines, since they did not seem to do the job for which drawings had been submitted. Response received to that telegram from Triplex was that the appellant could do anything with the machines it wished. One of these machines was the one in question here. There was another machine, which entered somewhat in the question of non-payment. After the original transaction between appellant and Triplex, the latter suggested that appellant should have a three-spindle attachment at a cost of $1,140. Appellant sent Triplex $1,140 for one of these attachments, but the attachments were later supplied to appellant by the War Production Board. Triplex according to appellant had not only one-third of the original cost of the replevied machine, but also this $1,140, and appellant had this in mind also when it refused to pay the trade-acceptance.

Meanwhile, Tidewater in the latter part of June discovered its mistake in delivering the machine without getting the bill of lading and its manager went to see the president of appellant. He was there shown the letter from Triplex, already referred to, in which the latter thanked appellant for the trade-acceptance. Subsequently, Triplex made demand on Tidewater for the sum of $3,535 which was the amount of the draft. The Universal Car Loading and Distributing Company, the originating carrier, also made demand on Tidewater. On August 7, 1943, after a futile meeting between representatives of Triplex and appellant, the replevin proceeding was instituted by Tidewater. The draft was returned by the First National Bank of Aberdeen to the Federal Reserve Bank at the latter's request on July 1, 1943. This was immediately after the appellant had sent and Triplex had received the trade-acceptance.

It is well settled by the decisions of this court that it is not necessary for the plaintiff in an action of replevin

to prove ownership of the property. It is sufficient if the proof shows a right of possession in the plaintiff. The nature of the right, i. e., whether it covers all time, as in cases of absolute ownership, or is limited, as in the case of a bailee, agent, or other person having only the right of possession for a determined period, may affect the question of damages, but it does not affect the right to bring the action. "Whoever is entitled to the possession at the time of bringing the suit, may maintain or defeat the action." *Rogers v. Roberts,* 58 Md. 519; *Shorter v. Dail,* 122 Md. 101, 89 A. 329.

A carrier, who through mistake, fraud, or otherwise, delivers goods to a person not entitled thereto is entitled to recover either the goods or their value from such person, if he refuses to return them. 13 *C. J. S., Carriers,* Sec. 173, page 342, and cases cited. "And it is held that where one wrongfully obtains possession without surrendering the bill of lading, the carrier may retake possession of the property or bring suit therefor at once." *Elliott on Railroads,* 3rd Ed., Vol. 4, page 533, paragraph 2150. In a case in Arkansas it was stated: "The railroad company had the right to the possession of the automobile shipped over its line to shipper's order, Wheatley, and it was its duty to retain and deliver it only upon the surrender of its bill of lading therefor. * * * Its agent permitted the taking of the automobile by appellant * * *. Having the right to the possession of the automobile, it could have retaken or brought suit therefor, any time after it was wrongfully received by appellant." *Tedford Auto Co. v. Chicago, R. I. & P. R. Co.,* 116 Ark. 198, 172 S. W. 1006, 1009. One case directly in point is where a shipment of slot machines from Baltimore to Lansing, Michigan, was delivered by the Grand Truck Western Railroad Company to a party who was not the bill of lading consignee, but who asserted that he represented such consignee. The bill of lading consignee subsequently demanded possession. The railroad officials called in the city police and the latter having found the shipment, took it themselves, claiming it to be contraband,

because it consisted of gambling devices. A replevin action was instituted by the railroad against the city. The court said that the police had no statutory mandate to seize gambling devices wherever found, and that the carrier was entitled to correct its mis-delivery by securing the return of the property. *Grand Truck Western Railroad Company v. City of Lansing,* 291 Mich. 589, 289 N. W. 265.

A Maryland case which is a replevin action by the consignor against the carrier shows these facts. A car of lumber was shipped by railroad, and the bill of lading was relinquished by the consignee to the railroad company before the car arrived, and an export bill of lading issued thereon. The consignee then became bankrupt, and the consignor tried to get the lumber back from the railroad. The railroad did make a partial delivery to it by mistake, the clerk so doing not knowing of the export bill of lading which had been issued on it. However, while the agents of the consignor were in the car taking marks off and putting a brand on the lumber, they were notified by the railroad that they could not have it, and thereupon the consignor took it under a writ of replevin. The contention of the consignor was that the lumber was delivered to him by the action of the clerk, and, therefore, he was entitled to the possession of the property. The court said even if what was done and said on that day amounted to a delivery of the property, if the consignor was not entitled to the possession of the lumber at that time, the fact that there had been such a delivery could not affect the question of the consignor's right to the possession at the time the writ was issued. "In order to justify that taking (under the writ), the burden was on the appellee (consignor) to show that he was then entitled to possession, and he cannot establish his title by showing that at some time previous to the issuance of the writ he obtained the naked possession of the property without any right thereto." *Baltimore & Ohio Railroad v. Rueter,* 114 Md. 687, 80 A. 220, 221.

It is suggested that Tidewater should have the bill of lading before it acquires a sufficient right of possession to bring this action. This view is based upon an erroneous conception of the nature and purposes of bills of lading. They are given by the carrier upon receipt of the goods, and in cases like the present are to be returned to the carrier at destination in exchange for the goods. But the carrier has no need for the bill of lading while it has the goods. It receives possession of them by delivery from the shipper, and continues to have the right of such possession until relieved by the specified method (that is, presentation of the bill of lading properly endorsed) or until some paramount right intervenes. The bill of lading in this case has been returned, and whoever holds it is not a party here. Tidewater's rights are not based on the bill of lading, but on the original possession it acquired by delivery of the machine to it in course of transit.

The question of Tidewater's right to possession, however, is to be determined, not as of the time of the mistaken delivery, but at the time of bringing the action. If at that time the situation had changed and a sale of the machine had been made by the consignor to the consignee, then the consignee had acquired the right of possession, and the carrier had no longer its limited right of possession. In a leading case in the Supreme Court of Georgia, the Southern Railway delivered a carload of shingles to the Wilson Coal and Lumber Company. A bill of lading was to be presented on delivery, and this could have been acquired by the consignee only upon payment of a draft. The Railway Company delivered the shingles without receiving the bill of lading, and the shipper sued the Railway Company for wrongful conversion. It appeared that after the consignors received information that the shingles had been delivered, they drew a draft payable thirty days after date upon the Wilson Company, which draft was accepted by the latter, and was sent for collection through a bank by the consignors, although it was not paid. The court said that

this action by the consignors was such an abandonment of the original purpose of requiring payment on delivery, and was such a ratification of the delivery as it had actually been made, as would relieve the Railway Company from liability for having made delivery before requiring the bill of lading. That such a transaction was equivalent to a sale of shingles by the consignors to the Wilson Company on a credit of thirty days. The title to the shingles passed by the sale, and so the plaintiffs in that action had no right of recovery against the Railway for their wrongful conversion. *Southern Railway Company v. Kinchen,* 103 Ga. 186, 29 S. E. 816. That was a suit by a consignor against a carrier for conversion, and this is a suit by a carrier against a consignee for return of the goods. Nevertheless, the same principle underlies both cases, which is that, if the subsequent dealings of the seller with the purchaser are such as to establish a sale on new and different terms, then the purchaser has acquired a right of possession to the goods, which the carrier cannot defeat in an action of replevin.

In another case in which the consignor sued the carrier, apples were shipped which were to be delivered on presentation of the bill of lading, and the bill of lading was sent, as in the case before us, with draft attached. The carrier by error delivered the apples without getting the bill of lading. When the seller heard of this, he entered into correspondence with the consignee, received part payment in cash, and took a trade-acceptance due in thirty-five days for the balance. When the trade-acceptance was not paid, the consignor sued the carrier. After stating that the consignor had waived the wrong committed by the carrier by dealing with the consignee, the court said that if after the settlement made with the buyer, the carrier had sued him for possession of the apples, "he could have successfully defended, upon the ground that he had made part payment, had given his note for the balance, and that the title thereby passed

to him." *A. D. Blowers & Co. v. Canadian Pacific Railway Company*, C. C., 155 F. 935, 937.

The facts in the case at bar show that after the wrongful delivery was made, appellant communicated with the seller, informed it that the machine did not work, and asked that something be done about it. The seller did not complain about the erroneous delivery. On the contrary, it accepted the trade-acceptance, which the appellant had sent, and arranged to have the machines gone over and put in proper condition. It sent the trade-acceptance through the banks for collection and when it was not paid because the machines had not been put in condition prior to the due date of the trade-acceptance, the seller arranged for its employees to visit the plant of the appellant, and put the machines in order, and said when this had been done (quoting its letter), "At this point, you will have no reason to say that our machines are no good, and, therefore, our Mr. Grano will then present you with the protested trade-acceptance." Meanwhile, the sight draft had been withdrawn. The seller had, therefore, accepted the trade-acceptance, had extended its time until the machines were put into order, and agreed that when this was done and by inference then only, would it expect to be paid for the machine. Completely new arrangements had been substituted for the original one. The delivery had been ratified, the seller's employees were to work on the machines while they were in the possession of the appellant, and the latter was treated by the seller as having purchased the machine. This is even more clearly shown by the response of Triplex to the telegram of July 28th from the appellant, after the employees of Triplex had failed to make the machines work to the satisfaction of appellant, and the latter had not paid the trade-acceptance. Appellant was apparently trying to get the seller to take the machines back, and asked what disposition should be made of them. The Triplex Company replied that the appellant could do anything with the machines it wished, indicating clearly that Triplex considered they had been

sold to appellant and that Triplex no longer had any rights in them.

The respective contentions of appellant and Triplex as to the amount due by the former to the latter have no place in this case. They must be settled in litigation between them, not in litigation between Tidewater and appellant. If Triplex sues Tidewater, or if its connecting and forwarding carrier, the Universal Car Loading and Distributing Company sues Tidewater for wrongful conversion, Tidewater's defense to that action may be proof of the agreement made by Triplex with the appellant. That case also is not being tried here, but facts which might constitute the defense of the carrier are in evidence here, and we construe them for the purposes of this case as establishing a new contract between appellant and Triplex and a sale to appellant of the machine replevied. Since that is so found, the appellant had the right of possession of the machine at the time of the action and the appellee had lost its limited right of possession as a carrier.

Various exceptions were taken in the course of the trial to the admission or exclusion of testimony, and to the form of the judgment, but in view of our conclusions, we find it unnecessary to consider them. We cannot agree with the judgment of the trial court in favor of the appellee, but are obliged to reverse it, and to enter a judgment in favor of the appellant, which now has the machine through the giving of a *retorno habendo* bond.

> *Judgment reversed, with costs. Judgment entered in favor of the appellant for the return of the property replevied, and costs.*