EDWARDS *v.* STATE
(Two Appeals in One Record)
[No. 147, October Term, 1950.]

*Decided June 15, 1951.*

*Motion for reargument denied, and Memorandum thereon filed, October 5, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*William J. McWilliams* and *Ridgely P. Melvin, Jr.,* for the appellant.

*Robert M. Thomas, Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *James C. Morton, Jr., State's Attorney for Anne Arundel County,* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

. Thomas Alexander Edwards, appellant, a Negro, 23 years old, was indicted by the grand jury of Anne Arundel County for the murders of John H. Mahlan and Mary C. Kline, of Glen Burnie, on September 17, 1948. The cases were removed to the Criminal Court of Baltimore, where he has been tried twice. At the first trial, which was held in February, 1949, he was found guilty of murder in the first degree and was sentenced to be hanged. The Court of Appeals reversed the judgments on the ground that appellant's confessions were obtained by offering an inducement to him and therefore were improperly admitted in evidence. *Edwards v. State,* 194 Md. 387, 71 A. 2d 487. At the second trial, which was held in June, 1950, he was again found guilty of murder in the first degree and sentenced to be hanged. On the present appeals his main contention is that. the evidence was not sufficient to sustain the convictions.

The record shows that Mahlan, 25, took Miss Kline, 18, for a ride in his Pontiac sedan on Friday evening, September 17, 1948, about 9:15 o'clock, and they did not return. On Saturday morning about 7 o'clock a Pontiac sedan was seen in a bean field along the Old Annapolis Road several hundred yards north of the Mountain Road. A garage man at Lipin's Corner notified the Anne Arundel County Police and three officers went promptly to the scene. They found the right side of the front seat and the floor in the back of the automobile soaked with blood. There was a bullet hole in the right front window and another in the left front window. There were also fragments of a bullet on the floor in front of the front seat. A woman's shoe was wedged under the rear of the front seat. Chief John H. Souers,

who arrived about 8 o'clock, observed footprints leading from the automobile. He followed them for about 250 feet until they were lost in the weeds near the little stream that runs through the field. The girl's father, John Edward Kline, identified the automobile as Mahlan's and the shoe as his daughter's. Kline made a search along the stream, and when he reached the two-plank bridge on the path leading to the Negro settlement of Freetown, he found Mahlan's motor vehicle operator's license torn into five pieces. Two of the pieces were on the bridge and the other three were on the ground.

On Sunday, September 19, Ernest Geisler, of Severna Park, one of many persons who searched for incriminating articles, found a bunch of keys in a hole more than a foot deep near the bridge. The keys were Mahlan's. The theory of the State is that the murderer abandoned the automobile and fled across the field toward the bridge, and tore up the operator's license evidently intending the pieces to fall in the stream, but in his haste dropped them and the keys on the ground.

On Monday afternoon, September 20, the bodies of Mahlan and Miss Kline were found by George Aisquith, a road worker, in a clearing about 175 feet from the Chesterfield Road near its intersection with the Defense Highway. This place was about 26 miles from the place where the automobile had been abandoned. There was no clothing on Miss Kline's body from the waist down except a shoe on her right foot. It was found at the autopsy that a bullet had entered the back of her head. Her left index finger had been nearly cut off by a bullet. On the right side of her head there was a hemorrhage, which indicated the probability that a heavy blow had been struck. There were also bruises on both knees. A bullet had entered Mahlan's left temple.

The bullets which were extracted from the two heads and also the fragments of the bullet found on the floor of the automobile were sent to the Federal Bureau of Investigation in Washington for examination with the object of determining the type of weapon from which

they were fired. In making the barrel of a pistol, a hole is drilled through a bar of metal, and after the hole has been finished a rifle cutter is passed through the barrel with a twisting motion, so that it cuts and scrapes away a thin shaving of the metal as it goes, thus leaving in the barrel a spiral of grooves. The spaces between these grooves are called lands. When the pistol is fired, these grooves and lands leave their marks upon the bullet.

Robert A. Frazier, special agent of the F. B. I. assigned to the laboratory, found that each of the bullets had faint rifling characteristics with no definitely defined dimensions or physical characteristics. While the rifling characteristics were not distinct, he found that the bullets had streaks faintly indicating that the weapon which fired them had been rifled with six lands and grooves turned in a right-hand or clockwise direction.

On Sunday afternoon, September 26, 1948, Carl Phelps, a Prince George's County farmer, found an empty cartridge case in the weeds where Miss Kline's body had lain. He gave the cartridge case to Mr. and Mrs. Russell Wade, of Millersville, and they immediately went to the Ferndale Police Station and turned it over to Chief Souers. The Chief examined it, put it in an envelope, and locked it in the safe. The next morning he handed the envelope to Officer Praley with instructions to take it to the F. B. I. in Washington. Frazier received the cartridge case on September 27 and designated it Q-4. On September 28 Officer Praley got it back from the laboratory and returned it to Chief Souers, who again locked it in the safe. On October 7 Chief Souers again delegated Officer Praley to take it to the F. B. I. laboratory. Frazier returned it to Sergeant Meade on November 10. It was thereafter in the custody of Chief Souers until the first trial.

On October 10 Officer Praley, accompanied by two other officers, went to appellant's home along Marley Creek near Freetown to look for empty cartridge cases, and they found one in the yard. On the following day he took it to the F. B. I., where it was designated as Q-12.

It was a 9-millimeter short cartridge case, commonly known as .380-caliber. On October 18 the F. B. I. reported: "No microscopic marks were present on this cartridge case for comparison with the cartridge case found near the body of Miss Kline."

On September 20 David Weishwar, of Millersville, found three unfired cartridges in a root beer bottle near appellant's home. The bottle was under a bag of crab shells in a pine bush about ten feet from the Marley Neck Road. He turned the cartridges over to the police. Robert M. Zimmers, special agent of the F. B. I. assigned to the laboratory, found that all three bullets were Czechoslovakian. By spectrographic examination he compared the three bullets with the bullets extracted from the bodies of the victims and found that they were of the same chemical composition and identical in all observable characteristics.

On October 9 appellant, who was known to be the owner of a pistol, was arrested as a suspect. On October 12, when he was interrogated by State and Baltimore City police at the Ferndale Police Station, he claimed that on the night when the murders were committed he went to a moving picture show in Baltimore. When he was asked where his pistol was, he said that he had sold it in August to one of the workmen at the American Sugar Refinery in Baltimore, where he was employed. The officers took him to the plant, but he could not find the man who he said had bought his pistol. He was released on October 12 and given two weeks to find the purchaser.

Appellant was arrested the second time on October 25, and was held in custody about two hours.

On November 8 he was arrested the third time and taken to the Waterloo Barracks of the Maryland State Police for further interrogation. There it was found that he had previously lied to the police, for he now admitted that he had never sold his pistol. He asked Sergeant Cassidy what would happen if they found his gun. Cassidy told him: "The gun would be sent to

where there would be a scientific examination made of it. It would depend on that examination as to just what would happen." Appellant finally decided to tell where his pistol was. He said that he had put it in the bottom of the cupboard in the kitchen of the house of his brother James where he lived. The officers went there and found the pistol where he said it was. It was a Czechoslovakian pistol of 9-millimeter short caliber, known as .380-caliber.

While in custody at the Waterloo Barracks, appellant also told the police that they could find a box of .380-caliber cartridges in the attic above his bedroom. The officers went there again and found the cartridges.

On November 9 Officer Praley took appellant's pistol to the F. B. I. He also took again the cartridge case found in appellant's yard. This time the cartridge case was designated Q-23. Frazier found (1) that the cartridge case picked up where Miss Kline's body had lain matched a test cartridge fired from the pistol as to firing-pin impressions, and (2) that the cartridge case picked up in appellant's yard also matched a test cartridge fired from the pistol. The F. B. I. thereupon made the determination that the two cartridge cases were fired from the same weapon.

Appellant contended that the cartridge case found where Miss Kline's body had lain should not have been admitted in evidence. It is a settled rule that an instrument of crime found at or near the place of the crime need not be positively identified as the instrument used in the commission of the crime before it may be admitted in evidence. A lack of positive identification of such an instrument affects the weight of the evidence rather than its admissibility. *Wilson v. State,* 181 Md. 1, 5, 26 A. 2d 770; *Cox v. State,* 192 Md. 525, 539, 64 A. 2d 732, 738. It was contended by appellant, however, that there was no mark of identification on the cartridge case to show that it was the case found near the Chesterfield Road. Of course, a cartridge case, like any other instrument, should not be admitted in evidence until it is adequately identified. But appellant made the same

contention on the first appeal, and we ruled that the cartridge case was sufficiently identified to be admissible. *Edwards v. State,* 194 Md. 387, 71 A. 2d 487.

Appellant cited *People v. Berkman,* 307 Ill. 492, 139 N. E. 91, where a physician testified that he could not identify a bullet as the one extracted from the body of the victim because he had handed the bullet to a nurse and no witness gave the name of the nurse. That case is quite different from the case at bar. It is true that the Wades did not put any mark on the cartridge case, but they turned it over to Chief Souers, and he put it in an envelope and wrote on the envelope "Shell found by Wade." Chief Souers explained that the case was still in the envelope when he sent it to Washington the second time on October 7, and he kept it in that envelope until the first trial. He explained that the original envelope was folded and placed in a new envelope typed by Sergeant Meade before the first trial. At the second trial an envelope contained the words: "Cartridge taken from under Mary Kline's body at the scene."

There was some uncertainty about the wording on the envelopes. Frazier said there may have been a smaller envelope in the one which carried his initials and the F. B. I. file number. However that may be, the fact that the cartridge case was received by the F. B. I. one day after it was found, and was the only one of its kind received by the F. B. I., whereas the case found in appellant's yard was not found until October 10, made it improbable that one case was confused with the other. Moreover, Frazier examined the cartridge case under a strong light at the trial and testified that he could positively identify it. He definitely testified: "That cartridge case was delivered to me at the F. B. I. laboratory by Officer Praley of the Anne Arundel County Police Department on September 27, 1948. * * * I received it again in the F. B. I. laboratory. * * * I returned it to Sergeant Meade of the Anne Arundel County Police Department on November 10, 1948." Because of the clear evidence of chain of custody of the cartridge case,

and its positive identification by the ballistics expert who examined it, we repeat that it was sufficiently identified to be admissible in evidence.

Appellant objected to the admission of the cartridge case for the further reason 'that it was not picked up until six days after the bodies were found and hence some one could have put it there after the murders were committed in order to incriminate him. We are not impressed by that suggestion. It is not disputed that in the evening after the bodies were found, the police officers searched for several hours as well as they could with lights, and in the morning they again searched through the weeds looking primarily for a weapon, but the officers recalled that it was difficult to find anything on account of the weeds. Sergeant Meade said that it was not until October 11 that a thorough search was made for all types of evidence by raking the underbrush and digging up and sifting the ground.

Appellant sought to discredit the F. B. I. laboratory experts by showing that in October the Bureau reported that there were no microscopic marks on the cartridge case found in appellant's yard for comparison with the cartridge case found where the body of Miss Kline had lain, whereas in November the Bureau reported that they were both fired from the same weapon. For many years ballistics has been a science of great value in ferreting out crimes that otherwise might not be solved. When a pistol is fired, a pressure is developed within the shell which drives the bullet out of the barrel, and the shell is driven back against the breech of the pistol with similar force. The markings on the hard breech of the pistol are thereby stamped on the soft butt of the shell. Testimony to identify the weapon from which a shot was fired is admissible where it is shown that the witness offering such testimony is qualified by training and experience to give expert opinion on firearms and ammunition. The testimony now in question is not discredited by the circumstance that the comparison of the two cartridge cases, which had been exposed to the

elements, with the test cartridge supported the inference that could not be drawn from comparison of the two alone.

In *Commonwealth v. Best,* 180 Mass. 492, 62 N. E. 748, 750, where it was claimed that two bullets extracted from the body of the murdered man had been fired from a Winchester rifle, the Court permitted the Commonwealth to show that another bullet had been fired from the same rifle. The bullet was admitted in evidence to show that the marks thereon coincided so closely with the marks on the two bullets as to prove that all three had been shot from the same barrel. It was contended by the defense that the conditions of the experiment did not correspond accurately with the conditions at the time of the murder because the rifle barrel might have been rusted in the two weeks that intervened, and because the gun had been fired three times after the murder, which would have increased the leading of the barrel. In rejecting those contentions, Chief Justice Holmes said: "We see no other way in which the jury could have learned so intelligently how that gun barrel would have marked a lead bullet fired through it, a question of much importance to the case. Not only was it the best evidence attainable but the sources of error suggested were trifling."

Likewise, the Court of Appeals of Kentucky has held that a witness skilled in ballistics may be permitted to testify that he identified the pistol from which a bullet found at the scene of the homicide was fired, as a result of comparison of markings on the bullet and on shells also found at the scene of the homicide with those markings found on bullets and shells fired by the witness through the pistol, the test upon which he based his observations and formed his opinion being described to the jury. *Evans v. Commonwealth,* 230 Ky. 411, 19 S. W. 2d 1091, 66 A. L. R. 360.

Frazier explained that comparison of two cartridge cases is made by means of a special microscope so constructed that microscopic marks on the two cases can be seen with one eye at the same time. He then gave the

following satisfactory explanation: "Every time a weapon fires a cartridge case, the firing pin may impress to different depths. Therefore, the cartridge case will pick up additional marks on a cartridge case in which the firing pin makes a deep impression as contrasted with one in which a shallow impression is made. So that an insufficient number of microscopic marks might be present on one cartridge case from a certain weapon for comparison with another cartridge case fired from the same weapon. I examined the specimen when it was originally submitted as Q-12 and found there were very few microscopic marks in the firing pin impression. At that time I concluded they were too few for comparison with another cartridge case. However, when I received the, weapon and fired the test cartridge case from it, I found on this cartridge case microscopic marks which were the same as the microscopic marks I found on the cartridge case submitted to me as having been recovered in Edwards' yard, indicating that that cartridge case * * * was fired from this particular weapon."

It was admitted by Frazier that the bullets extracted from the bodies had faint rifling marks, whereas appellant's pistol did not contain any lands and grooves when it was submitted to him. It was also admitted that there are other makes of pistols, such as the 9-millimeter Luger automatic, the barrels of which have six lands and grooves with a right-hand twist. It was reported that test bullets which were fired by the F. B. I. from a Luger had the same general rifling marks as the bullets extracted from the bodies. Hence, it was admittedly possible that the bullets could have been fired from a Luger. On the other hand, Frazier made it clear that appellant's pistol would normally contain six lands and grooves with a right-hand twist, and that it is possible to completely remove the rifling from a pistol by running steel wool through the barrel. He added, however, that if the barrel is in good condition, running a piece of steel wool through it only two or three times would not remove the lands and grooves; but if the

barrel is rusted, the lands and grooves could be removed more easily. Appellant, who was a gunner in the quartermaster corps in Europe during the Second World War and knew about filing out pistol barrels and the use of steel wool in removing rifling, admitted at the trial that he had filed out the barrel of his pistol in 1947, and that after the murders were committed he ran steel wool through the barrel of his pistol. He admitted also that his pistol had become rusted. He testified as follows: "It was raining, * * * the oil come to the top and the water sink to the bottom. It rusts some part of the gun." At one time in his testimony he said that he ran the steel wool through the barrel "several times only," but at another time he said that he did not know how many times he ran it through the barrel. Appellant's admismissions and the explanatory testimony of the expert were sufficient to warrant the Court in finding that the lands and grooves in the pistol were completely removed after the murders were committed.

Arthur B. Wilson, a guard in the death house at the Maryland Penitentiary, testified that he had overheard conversations of appellant with two other prisoners. One of the conversations was with a prisoner named Delmas Bozman on October 19, 1949, between 5:30 p. m. and 10:15 p.m. The guard testified as follows: "Edwards said Bozman sneaked up on a cab driver in an alley and shot him in the back. Bozman replied that what he did was not as bad as what Edwards did in sneaking up on those people when it was dark and shooting them. Edwards replied he was a damn liar, the moon was shining bright. He said he fixed it so nobody could prove he did it anyway. He wasn't as dumb as Bozman because he did not plead guilty."

The second conversation was with Edward Greer on December 11, 1949. From this conversation, which lasted several hours, the guard recalled the following: "He stated to Greer that the Seminarians could not help him and he did not want to talk to them as he had done everything he knew to keep Chief Souers from proving any-

thing on him. He stated to Greer that he was too smart for the hick cops in Anne Arundel County and had disposed of everything that could prove anything on him. He said he had thrown the watch overboard."

Appellant urged that these utterances should not have been admitted in evidence. It is a universally accepted rule that in proving oral utterances verbal precision is not required, but the substance or effect is sufficient. The reason for the rule is that the importance of single words in oral discourse is comparatively much less than in writings, and memory does not retain precise words except of simple utterances and for a short time. *Green v. State,* 96 Md. 384, 389, 54 A. 104; *Worthington v. State,* 92 Md. 222, 243, 48 A. 355, 56 A. L. R. 353; 7 Wigmore on Evidence, 3d Ed., secs. 2094, 2097. In this case the witness said that the death house in the Penitentiary was so arranged that he could be within ten feet of the cells, and he had a table and chair which enabled him to take notes. He testified that he gave careful attention to everything that was said and took notes of the main points of the conversations, from which he made a formal report to the Warden of the Penitentiary. While he repeated only a few sentences from conversations that lasted several hours, he swore that he could remember the main points of practically the entire conversations. He used his notes to refresh his recollection at the trial.

Appellant placed reliance on *O'Neill v. United States,* 8 Cir., 19 F. 2d 322, 325, wherein it was held that the trial Court had erroneously admitted in evidence a summary of statements alleged to have been made by the appellant. But in that case it was explained that the so-called summary of statements was not the substance of what the appellant had said at all, but was a statement of conclusions which the witness had deduced from a conversation with narcotic officers. In the case at bar the witness gave the substance of appellant's conversations as far as it related to the case, and he did not give

his own deductions.  For these reasons we hold that the oral utterances were admissible.

It is significant that the utterances were characteristic of appellant, as he was a garrulous braggart who had utter contempt for the police.  In addition, the utterances substantiate other pieces of evidence in the case.  For instance, according to the official report of the United States Weather Bureau, there was a full moon on the night of September 17, 1948.  Likewise, the statement about the watch coincided with the testimony of Mrs. Kline that her daughter wore a wrist watch, which has never been found.  The guard swore that this was the first time he had heard any mention of a watch in this case.

Appellant testified at the first trial that he arrived at Camp Kilmer, New Jersey, on December 31, 1945, and that he bought his pistol from another soldier at that camp with money which he had made by shooting craps on the voyage back from Europe, and after moving from the home of his aunt in Curtis Bay to the home of his brother James near Marley Neck, he tried to shoot it. In the summer of 1947, after he was unable to get Czechoslovakian ammunition for the pistol, he went to a friend's machine shop and tried to enlarge the barrel with a rat-tail file.  He was able to get the cartridge into the chamber, but the pistol would not fire, as the cartridge was too large for the mechanism.  Later, when he succeeded in locating smaller bullets, he practiced shooting at targets on his father's property and at other places around Marley Neck.  He admitted that in the spring of 1948 he bought a dozen or more rounds of Remington bullets, and about a week later bought a whole box of shells, and afterwards bought a box of 9-millimeter Czechoslovakian cartridges.  He admitted that he had carried his pistol to the sugar refinery because of some quarrel he had with one of the workmen there.  He also admitted that he carried his pistol with him when he went about the country at night.

148

The trial Court evidently did not believe appellant's story that he put his pistol in an icebox outside his father's home before the murders were committed and did not take it out of the box until the first week in October. We see no reason to believe this story. Appellant showed himself to be a brazen liar on a number of occasions and some of his stories are not plausible. He testified that after he read in the newspaper that the police had found some foreign-made shells, and he heard that the police were searching houses for weapons, he took his pistol out of the icebox, put it in an oil can and covered it with oil, and put the can between some trees along the path leading from his father's house to his brother's house. He then testified that early in November, after he had been arrested twice, he took the pistol out of the can, oiled it, and wrapped it in a piece of cloth and put it in the cupboard in his father's house, where the police found it.

Appellant admitted that he had put the bullets in the bottle and left it along the road. In explaining this incident, he said that he had three bullets in his pocket, and one of them dropped through a hole in his pocket. When he heard it fall, he stopped and picked it up. Seeing some bottles along the road, he put the three bullets in one of the bottles, left the bottle alongside the road and continued on his way. He told the Court that it was his intention to go back for the bullets and "pick them up some time," but soon afterwards he read in the newspaper that the police had found three bullets, and he thought they may have been the bullets which he had put in the bottle. When he went to look for them, they were gone. He declared that he did not "hide" the bottle. Nevertheless, the trial Court had the right to believe that when he put the bullets in the bottle and left the bottle in the bush, he feared that the police might find the bullets in his pocket. He admitted that he did not have a hole in any other pocket.

For his alibi appellant testified that on the evening of September 17, 1948, he went to his mother's home about

7:30 o'clock, and while listening to the radio fell asleep and woke up about 10:30, and then walked to Kinder's store on the Solley Road, reaching there shortly before 11:30.  He said that he did not go into the store because Kinder had criticized him for shooting his pistol near the store, and in anger he told Kinder that he would never enter his store again.  For that reason he asked a boy named Stevenson to go in the store and buy some peanuts and potato chips for him.  He then testified that shortly after 11:30 he met William A. Jackson and his wife near their home on the Solley Road, and then continued to the home of William Sedgewick, with whom he talked for several minutes, and then went to the Freetown Hall, where a promenade party was being held.  He said that he arrived there about midnight but remained outside about two hours.  He said that he left there about 1:50 a. m. with George Kess and walked to the Kess home in the woods between the Solley Road and the Marley Neck Road.  He said that he finally walked to the home of his brother James, where he read the newspaper and went to bed.  He said that he arose at 6 and worked at the sugar refinery nine hours that day, and continued to work there every day thereafter until he was arrested.  He was corroborated by these persons at the trial.

It is evident that the trial Court either did not believe some of the details of the alibi or else felt that, even though it was substantially true, there was ample time in which appellant could have committed the murders. The only witness who saw appellant at the Freetown Hall was his aunt, Catherine Hall.  She testified that she saw him for a few seconds but did not talk to him. Appellant claims that for two hours he conversed with friends in the yard outside the hall.  However, there were no witnesses who testified that they talked with him during that period.  It is not known exactly where and when the murders were committed, but in any event consideration must be given to the fact that it does not

take long to drive an automobile 52 miles on a good highway.

Appellant urged that Mahlan's car must have been abandoned after 4 o'clock. He predicated this contention on the premise that the engine of the car was warm when it was found after 7 o'clock. The evidence on this point, however, is not entirely convincing. Chief Souers testified that the sun was up early that morning and the temperature was 70 degrees, and "the sun shining on the hood of the car would make it very warm." The garage man who towed the car testified that he never touched the motor, but the splash pan was warmer than a chain which he had kept stored in a metal box out of the sun. In February, 1949, a test at different hours was made of the engine temperature of a Pontiac automobile, which had been driven a distance of about 14 miles. However, as the witness who conducted the test explained, the results would vary in each case according to the temperature of the water in the radiator at the time the test was commenced.

If the murders were committed after 2 o'clock, the trial Court was still not required to believe the alibi. Appellant claimed that he left the Freetown Hall at 1:50. He said that when he reached the home of his brother James, his brother Sam had not yet arrived home but came in soon afterwards, and they slept in the same bed in the dining room. His story is considerably shaken by the testimony of Lieutenant Bryan, of Detective Headquarters in Baltimore, that appellant told him that when he arrived at the home of his brother James, everybody had gone to bed and he slept alone on a couch in the kitchen. The only witnesses who corroborated appellant as to the time he reached the house that night were his brother Sam and his sister-in-law, Dallas Edwards, who testified that she heard appellant and Sam talking in the next room, and that she saw him when he left in the morning. In considering the alibi we must give due credit to the judgment of the trial judges who saw

and heard the witnesses and observed their demeanor on the stand.

We are mindful of appellant's testimony that he was not acquainted with either of the victims. The State suggested that the motive may have been robbery. Appellant, in reply, maintained that he earned more than $52 a week and that he had just received his pay and was not in need of money. On the other hand, the State pointed out that Mahlan's wallet has never been found. The State also suggested that the motive may have been rape. Appellant replied that there was no evidence from the autopsy to indicate rape. Yet Miss Kline's body was almost completely naked, with a shoe on her right foot and the other shoe wedged under the seat of the car.

Rule 7 (c) of the Criminal Rules of Practice and Procedure provides that when a criminal charge has been tried by the Court, an appeal may be taken as provided by law, and upon appeal the Court of Appeals may review upon both the law and the evidence to determine whether in law the evidence is sufficient to sustain the conviction. But the verdict of the trial court shall not be set aside on the evidence unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

As we said in *Lambert v. State,* 196 Md. 57, 68, 75 A. 2d 327, 332, this rule was not intended to authorize a reversal of a judgment of conviction merely because the conclusion of the Court of Appeals on the record may be different from the conclusion of the trial Court, but was adopted to prevent a possible miscarriage of justice by permitting the trial Court to take away the life or liberty of an accused through manifest error without the possibility of appellate review.

As we cannot say that the verdicts of the trial Court were clearly erroneous, the judgments of conviction must be affirmed.

*Judgments affirmed.*

## MEMORANDUM ON MOTION FOR REARGUMENT

### PER CURIAM.

The vigor and earnestness which have marked the defense in this case are manifest in the motion for reargument. Counsel assail the conclusion reached by this court and its reasoning on the several matters of fact or evidence discussed in the opinion and previously in the briefs and at the oral argument. They say their "most important single contention * * * was that the evidence, being entirely circumstantial, did not exclude to a moral certainty every other reasonable hypothesis than that of guilt. * * * this is the first time the question has been squarely presented to this court and it was hoped that the court would adopt or reject the rules which have been followed in other jurisdictions for many years. But it appears that the court has failed to give the question any consideration whatever. * * * The court's opinion becomes authority for the proposition that Maryland has no definite rules for the appraisal of circumstantial evidence, upon which, as in this case, a man's life may be forfeit * * *. * * * If each trial court is to be allowed to adopt and apply its own conception of the proper circumstantial evidence rule how can this court ever say that the judgment of the trial court is clearly erroneous, especially when the trial court, as in this case, does not disclose which rule is followed, if any? * * * If trial courts can believe or not believe, as fancy dictates, undisputed and uncontradicted alibi testimony, especially where the state has not proved the presence of the defendant at the place and at the time of the crime, then alibi has become a vestigial defense. * * * for this court to say that the trial court can elect to believe or disbelieve, where there is no conflict, where the testimony is undisputed, uncontradicted, inherently credible and from unimpeached witnesses, is an act of appellate abdication." If the opinion of this court warrants these assertions, then (aside from the vital importance of this case to Edwards himself) this court,

in construing and applying its own rules which broadened
—or were supposed to broaden—the scope of appellate
review in criminal cases, has produced confusion worse
confounded as to the relation of appellate review to
credibility of testimony.

No case in this court has involved the application of
the 1950 amendment of section 5 of Article 15 of the
Maryland constitution, see Laws of 1949, c. 407. In
*Wright v. State,* 198 Md. 163, 81 A. 2d 602, decided the
same day as the instant case, application of that amend-
ment was missed by one day. That case involved the
application of Rule 6 (b) (before it was amended in
1951) of the rules of criminal procedure effective Jan-
uary 1, 1950. *Lambert v. State,* 196 Md. 57, 75 A. 2d
327, like the instant case, involved application of Rule
7. The terms of Rule 7 and the antecedents of that rule
in this court and in the Supreme Court leave no doubt
that the scope of appellate review, with respect to
credibility of witnesses is exactly as stated in Rule
7 (c), viz, "Upon appeal the Court of Appeals may
review upon both the law and the evidence to determine
whether in law the evidence is sufficient to sustain the
conviction, but the verdict of the trial court shall not
be set aside on the evidence, unless clearly erroneous,
and due regard shall be given to the opportunity of the
trial court to judge of the credibility of the witnesses."
Even superficial comparison of Rule 7 of the criminal
rules with Rule 9 of the civil rules (effective in 1941),
the previous decisions of this court in equity cases, Rule
52 (a) of the federal rules of civil procedure (effective
in 1938) and Rule 23 of the federal rules of criminal
procedure (effective in 1946) shows both the substantial
identity of the scope of appellate review and also minor
differences in procedural details with respect to credi-
bility of witnesses, in law, equity and criminal cases, in
Maryland and in the federal courts. Criminal Rule 7 (c)
provides that "the verdict of the trial court shall not
be set aside on the evidence, unless clearly erroneous,
and due regard shall be given to the opportunity of the

trial court to judge of the credibility of the witnesses."
Rule 7 (a) provides, "The Court [sitting without a jury]
may render such verdict without comment, or it may
state in open court the grounds for its decision." Rule
9 (c) of the civil rules provides, "When a proceeding
has been so tried by the court, an appeal from the judg-
ment, if allowed by law, may be taken according to the
practice in equity. Upon appeal the Court of Appeals
may review upon both the law and the evidence, but the
judgment of the trial court shall not be set aside on
the evidence, unless clearly erroneous, and due regard
shall be given to the opportunity of the trial court to
judge of the credibility of the witnesses. The Court of
Appeals may affirm, reverse, modify, or remand, as in
appeals from equity." Rule 9 (a) provides, "The court
shall dictate to the court stenographer, or prepare and
file, a brief statement of the grounds for its decision
and the method of determining any damages awarded."
Code, 1947 Supp., page 2053. Rule 52 (a) of the federal
rules of Civil procedure requires findings of fact and
provides, "Findings of fact shall not be set aside unless
clearly erroneous, and due regard shall be given to the
opportunity of the trial court to judge of the credibility
of the witnesses." Rule 23 (c) of the federal rules of
criminal procedure provides, "In a case tried without
a jury the court shall make a general finding and shall
in addition on request find the facts specially." In the
instant case the defendant complains that the trial court
gave no reasons for its verdict and made no special
findings of fact. It is sufficient in this respect to note
that criminal Rule 7 is different from civil Rule 9
and from the federal civil Rule 52 (a) and the federal
criminal Rule 23 (c).

It is also to be noted that application of Rule 7 cannot
be "an act of appellate abdication", since Rule 7 is the
first and only source of authority for appellate review
of facts in criminal cases. Until adoption of the federal
and Maryland rules of civil and criminal procedure there
was (perhaps with special exceptions under federal

statutes) no appellate review of facts at all in the federal or Maryland courts in civil cases at law or in criminal cases. The reason for this fact was historical and statutory, and Maryland and Congressional statutory history were different, but the fact is beyond question or doubt. Until *Patton v. United States*, 281 U. S. 276, 50 S. Ct. 253, 74 L. Ed. 854, power to waive trial by jury in a criminal case in a federal court was doubted. Under Rule 23 (a) criminal cases shall be tried by jury "unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government". Consequently, in Maryland trial of criminal cases without a jury is rare in the federal court, though trial by jury is relatively rare in the state courts.

Some years before the adoption by this court of the rules of civil or criminal procedure, but comparatively late in the history of Maryland, this court recognized that in an equity case the chancellor who "had the benefit of the presence of the witnesses * * * was in a better position to judge of the credibility of the testimony" *Coburn v. Shilling*, 138 Md. 177, 199, 113 A. 761, 769, and "found occasion, in numerous decisions, to enunciate the rule that this Court is loath to reverse the lower court upon a finding of fact unless the evidence clearly demonstrates that such finding was erroneous, for the sufficient reason, often stated, that the chancellor has the benefit of seeing and hearing the witnesses, observing their manner of testifying and general demeanor, or, in other words, having the benefit of the atmosphere surrounding the trial." *Sporrer v. Ady*, 150 Md. 60, 70, 132 A. 376, 380. Though this rule or similar rules had previously been enunciated by other courts, this court regarded the rule as a glimpse of the obvious and not as resting on authority from other jurisdictions. The application of the rule is not always obvious, but the rule was repeatedly enunciated in equity cases before (as it has been since) it was carried over, by rules of court, from equity procedure to cases at law and criminal cases. *Oertel v. Oertel*, 145 Md. 177, 178-179, 125 A. 545; *Bortner v.*

*Leib,* 146 Md. 530, 546, 126 A. 890; *Gimbel v. Gimbel,* 148 Md. 182, 187, 128 A. 891; *Pattison v. Brydon,* 150 Md. 575, 584, 133 A. 328; *Farmers' Milling and Grain Company v. Urner,* 151 Md. 43, 50, 134 A. 29; *Moran v. O'Brien,* 156 Md. 221, 222, 144 A. 257; *McClees v. McClees,* 160 Md. 115, 119, 152 A. 901; *Jacobs v. Jacobs,* 170 Md. 405, 413-414, 185 A. 109; *Garner v. Garner,* 171 Md. 603, 615, 190 A. 243. The reason for the comparatively late enunciation of this rule in equity cases was the opposite of the reason for the still later application of it, by rules of court, in cases at law and criminal cases. In the latter cases affirmative action was needed because there had been no appellate review of the facts at all in such cases. In equity cases on appeal (unlike writ of error) questions of fact as well as questions of law had always been reviewable, but until testimony was taken in open court the chancellor had no better opportunity than this court to judge of the credibility of the witnesses. Taking of testimony in open court has only been a right since 1896. Acts of 1896, ch. 35; Code of 1939, Art. 16, secs. 290-291. By Equity Rule 45, adopted in 1883 (Code of 1888, Art. 16, sec. 225), testimony might be so taken, in Baltimore only, by agreement with the concurrence of the court.

In the federal courts the taking of testimony in open court was authorized by the Judiciary Act of 1789, but by subsequent statutes and rules of court, such taking of testimony, or appellate review of questions of fact, was so restricted that very different legislative history produced results much the same as in Maryland. Not until adoption of the "new" federal equity rules, effective February 1, 1913, did taking of testimony in open court become the regular method of taking testimony. Rule 46, 226 U. S. 661. By 1938, when the federal rules of civil procedure became effective, the rule as to review of facts on appeal adopted in Rule 52 (a) had become, in the federal courts as in Maryland, "the modern equity rule". The "modern equity rule" was thus adopted, for non-jury cases either at law or in equity, not with-

out opposition by judges and lawyers as to the wisdom of thus extending the scope of review of facts in non-jury cases at law. But that this is the true construction and the effect of Rule 52 (a) has never been doubted. The intent and effect of Maryland Rule 9 was the same. See Reporter's Explanatory Notes, Code, 1947 Supp., pages 2086-2089. So far as we have ascertained, neither the propriety nor the plain meaning of either of the substantially identical provisions of federal Rule 52 (a) and Maryland Rule 9 restricting appellate review of credibility of testimony has ever been questioned. Rule 9 has been cited by this court as a statement of the same rule now applicable (by decisions of this court) in equity and (by rule of court) at law. *Wallace v. Fowler*, 183 Md. 97, 99, 36 A. 2d 691; *Harford Metal Products Corp. v. Tidewater Express Lines*, 183 Md. 105, 107-108, 36 A. 2d 677. In the Reporter's Notes on Criminal Rule 7 it is said, "This proposed rule is a complete departure from existing law that criminal trials by the court without a jury are subjected to the same rules of procedure as those with a jury, including appealability." That is, Rule 7 is a complete departure from the preexisting law which permitted no appellate review of facts. Until the motion for reargument in this case it has not been suggested that the provision that "the verdict of the trial court shall not be set aside on the evidence, unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" means any less than it says or than the provisions, substantially the same, in civil Rule 9 and the federal civil Rule 52 (a).

If we assume that circumstantial evidence, or all the evidence of any kind, must "exclude to a moral certainty every other reasonable hypothesis than that of guilt", this assumption does not change the result in the instant case—and does not furnish any "definite rule for the appraisal of circumstantial evidence". In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a

rational inference of, the fact to be proved. In a civil case the fact must be shown, or the inference supported, by a preponderance of probability or an opposite preponderance must be overcome. In a criminal case the fact must be shown, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. The difference in degree of proof is ordinarily for the triers of facts.

If we also assume that trial courts cannot "believe or not believe, as fancy dictates, undisputed and uncontradicted alibi testimony", again the assumption leads nowhere in the instant case. Counsel ignore the distinction between "(a) uncontradicted evidence which a jury [or other trier of facts] might disbelieve and (b) uncontroverted or undisputed facts, which present only a question of law." *Dunstan v. Bethlehem Steel Co.*, 187 Md. 571, 578, 51 A. 2d 288, 291; *Alexander v. Tingle,* 181 Md. 464, 30 A. 2d 737. Some of the alibi testimony may be, in a narrowly verbal sense, uncontradicted; it is in no sense undisputed. The testimony regarding the gun, the bullets and the cartridge cases (if believed) tends to show the presence of Edwards at Chesterfield and at the scene of the murder (wherever that was); by this testimony the alibi testimony is disputed and, in a proper sense of the word, contradicted. Such circumstantial evidence may be more persuasive than dubious identification by an eye-witness. Counsel attack the testimony of the Anne Arundel police and argue or broadly hint that they may have "planted" the cartridge case at Chesterfield. It may be assumed that, in the loss of some of Miss Kline's clothing and perhaps other evidence and in enlisting a mob of amateurs to search for the bodies and for other evidence, and in somewhat delayed searches of their own, the county police fell short of the most modern metropolitan police methods. But murder and convictions of murder are older than modern police methods. This is not the first case in which important evidence has been found by amateurs. Moreover, there is nothing amateurish about the F. B. I.

investigation or testimony. No doubt at the trial and on motion for new trial counsel argued the possibility of "planting" the cartridge case and this argument was considered. But neither the alibi testimony nor the police testimony justifies us in finding such "planting" as a matter of law or an undisputed fact, or in treating it as other than an assertion unsupported by evidence that the police had either the desire or the necessary information to perpetrate such a crime against Edwards days before his gun or any other bullets or cartridge cases of his had been found or he had been arrested. As is indicated in our opinion, the alibi testimony is not without inherent weaknesses. Counsel argued before us that the girls Edwards says he saw at the hall were afraid to testify in support of his alibi. There is no evidence of this. We assume that the triers of fact considered this argument. We are quite unable to say, as a matter of law or a notorious fact, that in Anne Arundel County or elsewhere in Maryland negro girls are prevented, by fear of the police, from testifying to the truth in a murder case. Of course, trial courts are not at liberty to believe or disbelieve testimony "as fancy dictates"; we are not at liberty to assume that they have done so. Lying to the police is not a capital offense and is not perjury. But Edward's boasting that he lied when first questioned about his whereabouts on the night of the murders does not strengthen his alibi. He did not testify at the second trial, but the state offered in evidence testimony by him at the first trial. Inherent weakness in this testimony is no less visible to us than to the triers of fact. Yet counsel complain no less of our suggestion of doubt as to his credibility than of our failure to proclaim faith in the other alibi testimony.

Counsel ask how we could ever say that the trial court is clearly wrong. This question can only be answered as and when it is presented, case by case. If we recognize the difference between the roles of triers of facts and appellate courts, and the terms of Rule 7, it is to be expected that such cases will be rare, as we

indicated in *Lambert v. State, supra.* In *Wright v. State, supra,* we held the evidence legally insufficient to sustain a verdict of guilty.

In the famous case of the infamous Rosenthal murder, the question of guilt of Becker, the police lieutenant, depended almost entirely upon the credibility of tainted testimony. Becker was not present at the shooting. The question was whether or not he was one of the conspirators who employed the four gunmen to do the shooting. Becker was twice convicted, twice appealed to the New York Court of Appeals, and ultimately the death sentence was executed. The principal witnesses against him were three co-conspirators, who had been promised immunity in return for their testimony. At the first trial practically the only "corroboration" of the three accomplices was furnished by a witness whom "some of the members" of the Court of Appeals held to be a fourth conspirator. The judgment was reversed because of unfair rulings by the trial judge. At the second trial the "corroborating" conspirator did not testify, and less vulnerable witnesses furnished corroboration.

Section 528 of the New York Code of Criminal Procedure provides, "When the judgment is of death, the court of appeals may order a new trial, if it be satisfied that the verdict was against the weight of evidence or against law, or that justice requires a new trial, whether any exception shall have been taken or not in the court below." In substance this provision has been in force since 1855. In effect it imposes the power and duty to review the facts on appeal as upon a motion for a new trial. On the first appeal the opinion of the court was delivered by Judge (later Chief Judge) Hiscock, Judge (later Governor) Miller delivered a concurring opinion for reversal on the facts, Judge Werner a dissenting opinion for affirmance. In the opinion of the court it was said, "The law does cast upon us in such a case as this the burden and responsibility of deciding before permitting execution whether a verdict is supported by

the weight of evidence. That, of course, does not mean that we are to take the place of the jury in passing upon those ordinary questions of the reliability of witnesses and of the credibility of testimony which constantly arise in trials or that we are to overturn the verdict simply because as an original proposition we might have reached a different result. It does mean, however, that we must say if that question should be reached whether, taking into account the undisputed and clear infirmities of the People's witnesses and case, we believe that there is still left such a preponderating weight and balance of apparently worthy testimony as justified the jury in finding that the affirmation of the defendant's guilt was so unclouded by the shadow of any reasonable doubt that the state would be justified in taking his life.

"While no one doubts that in the great majority of cases the character and credibility of witnesses and the believability of testimony should be left to the final determination of a jury, yet the fact that the statute imposes upon us the absolute duty of deciding whether a verdict in a murder case is against the weight of evidence would seem to make it equally plain that the law contemplates the possibility that a jury may be swayed or led into giving an unjust and unwarranted verdict and requires us to correct the error when it does occur. Some of my associates believe that the contention of the appellant is entirely correct and that the present verdict should be thus set aside. But since the consideration of that question might lead to a difference of opinion amongst the majority members of the court, I propose to pass it, expressing no view either way, and proceed to the discussion of another proposition concerning which there will and can be no difference of opinion." *People v. Becker,* 210 N. Y. 274, 288-289, 104 N. E. 396, 402.

On the second appeal, Judge Miller had resigned and Judge (later Chief Judge) Cardozo, then a new judge, sat. Judge Werner did not sit, and Chief Judge Bartlett, who did not sit on the first appeal, delivered the opinion of the court. Judge Hogan dissented, without an opinion,

from the opinion and the judgment of affirmance. In the opinion the court said, "We desire that the views which lead us to affirm this judgment shall be made unmistakably clear. Doubtless, a very strong argument can be made in favor of the defendant, based upon the inducement of the avowed accomplices to swear falsely, their opportunity to fabricate evidence, and the lack of conclusiveness in the corroboration. All this, however, was a question for the jury with whose determination we are not justified in interfering unless we can say that it was plainly wrong—which, as already stated, we cannot say. Therefore, unless the rules of law which have heretofore governed the disposition of criminal appeals are to be changed merely because there might have been a refusal to convict on this evidence, we think (1) that they required the submission of the issues of fact to the jury; (2) that the case was fairly and impartially tried; (3) that no errors of law were committed prejudicial to the defendant, and (4) that the verdict cannot be deemed to be against the weight of evidence or against law within the meaning of section 528 of the Code of Criminal Procedure. It is not our duty to try the case over again upon the printed record. We have not seen the witnesses. We are deprived of the aid furnished by their appearance, demeanor, facial expression and manner of testifying. These advantages the jury enjoyed; and there being sufficient evidence in quantity and quality to take the case to the jury, their verdict, in the absence of any of the statutory grounds for reversal, is conclusive even upon the Court of Appeals." *People v. Becker*, 215 N. Y. 126, 158-159, 109 N. E. 127, 137.

We adhere to our conclusion and our opinion. We find no occasion to add to or subtract from the discussion, in the opinion, of details of the evidence.

*Motion denied.*